J-S76034-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| KEVIN MCCLAIN | |
| Appellant | No. 2048 EDA 2015 |

Appeal from the Judgment of Sentence June 1, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0003983-2014

BEFORE:  STABILE, J., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED NOVEMBER 09, 2016**

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following Appellant's conviction by a jury on the charges of attempted murder, aggravated assault, firearms not to be carried without a license, carrying firearms in public in Philadelphia, and possession of an instrument of crime.[1]  Appellant contends (1) the evidence was insufficient to sustain his convictions; (2) the jury's verdict is against the weight of the evidence; and (3) the trial court erred in admitting evidence of Appellant's video searches from the website YouTube, as well as Detective Timothy Hartman's narration of the searches.   We affirm.

_____

[*] Former Justice specially assigned to the Superior Court.
[1] 18 Pa.C.S.A. §§ 901(a), 2702(a)(1), 6106(a)(1), 6108, and 907(a), respectively.

The relevant facts and procedural history are as follows: Appellant was arrested in connection with the attempted murder of Terell Autry, and represented by counsel, he proceeded to a jury trial, at which numerous witnesses testified. Specifically, Sarith To, the owner of Sunny's Deli, testified that, on January 12, 2014, at 12:00 a.m., he was working at the deli when he heard eight to ten gunshots coming from the side parking lot. N.T., 1/13/15, at 33-34. Mr. To testified that, just before the shooting, Appellant had been in the deli. *Id.* at 43-44. He noted that he gave the surveillance footage from the deli's security cameras to the police. *Id.* at 48. He indicated the footage did not capture the shooting but it did capture a man running from the area. *Id.* at 54. Mr. To testified that Appellant had been a frequent customer at the deli, but he had not seen Appellant in the deli since the night of the shooting. *Id.* at 20-22, 33-34, 41-45, 53.

Terell Autry testified that he lived near the deli, and on the night in question he went to the deli. *Id.* at 58-60. Therein, he saw a man named "Twon" and noticed that another man was standing next to him. *Id.* at 61. As Mr. Autry was walking through the deli's side parking lot, he heard gunshots coming from behind him, and he began to run without turning around. *Id.* at 61-62. Mr. Autry suffered bullet wounds to his left arm and right leg, as well as "graze wounds" to his ribs and left eye. *Id.* at 63-66. He testified he heard approximately ten shots being fired at him but he did not see who shot him. *Id.* at 62, 80.

After the shooting, Mr. Autry was taken to the hospital via ambulance and, at 1:20 a.m., he gave a statement to the police. *Id.* He also gave a statement to Detective Hartman after he was released from a rehabilitation center. *Id.* at 83-84. Both times, Mr. Autry indicated he did not know who shot him. *Id.* at 85-86. At trial, Mr. Autry denied ever seeing Appellant before or knowing why he would want to shoot him. *Id.* at 84-85. He testified that he neither had any problems nor confrontations with Appellant. *Id.* at 90. Mr. Autry indicated that, about three months prior to the instant shooting incident, someone "shot up" his house, where he lived with his brother, by the deli. *Id.* at 99. The police never discovered who was involved in that shooting. *Id.*

Police Officer James Wheeler testified that, on January 12, 2014, at 12:08 a.m., he was on patrol with his partner when they received a dispatch for "a person with a gun" near the address of the deli. *Id.* at 125. The dispatcher then reported that the victim would be at a particular address, which was the home where the victim lived with his brother near the deli. *Id.*

Upon arrival, Officer Wheeler found the victim, Mr. Autry, lying on the front porch and bleeding profusely. *Id.* at 127-28. Mr. Autry told the officer he had been shot while walking in the parking lot by Sunny's Deli. *Id.* at 130-31. Mr. Autry's older brother informed the officer that, while he was on the front porch with the victim, he had seen a black male, wearing a black

hoodie, running southbound on the street where the Autry brothers lived. N.T., 1/14/15, at 8, 20-22, 25, 31. This information was broadcast over the police radio. *Id.* at 13.

Police Officer Tyrone Bacon testified that he received the same radio dispatch as Officer Wheeler, and he was the first officer in the parking lot to search for evidence. He discovered spent casings in the middle of the parking lot next to the deli. *Id.* at 49. The casings were found in an area outside of the view covered by the deli's security cameras, and Officer Bacon circled the area with chalk. *Id.* at 57. Officer Bacon indicated that at some point he heard the flash information of "black male with a hoodie," as to the description of the suspect. *Id.* at 75.

Detective Vincent Rimshaw testified that he was assigned to investigate the shooting, and accordingly, at approximately 1:00 a.m. on January 12, 2014, he went to the hospital to speak to the victim, Mr. Autry. *Id.* at 79-80. Due to Mr. Autry's injuries, the interview was brief, and Mr. Autry was unable to tell the detective who shot him or provide a description of the shooter. *Id.* at 81.

At approximately 1:45 a.m., Detective Rimshaw arrived at the parking lot, which had already been secured by the uniformed officers, and he recovered fifteen spent 9 millimeter cartridge casings. *Id.* at 80-81. The seizure was placed on a property receipt, and the seized spent casings were sent to the Firearm Identification Unit's forensic laboratory for testing. *Id.* at

93-96. Detective Rinshaw noted that it is not possible to lift a fingerprint from a fired shell casing unless it is handled after it has been fired. *Id.* at 102-03. Detective Rimshaw noted that, after seizing the spent casings, he reviewed the video footage from the deli's outside surveillance camera. From the footage, he saw no vehicles leaving the parking lot, but he noticed a black male wearing a sweatshirt with a tiger on it. *Id.* at 99-101, 108. The video showed the male with the tiger sweatshirt standing behind the victim, and the detective considered him to be "a person of interest." *Id.* at 108.

Police Officer Raymond Andrejczak, an expert in firearms identification, testified he was given fifteen spent casings to examine. *Id.* at 116. He was not given a firearm to which he could compare the fifteen spent casings; however, he microscopically examined the fired casings and opined they were all fired from the same firearm. *Id.* at 126-27. Officer Andrejczak noted he did not examine the fired cartridge casings for fingerprints and, to the best of his knowledge, he is unaware of any case where fingerprints were lifted from a fired cartridge casing. *Id.* at 129-30.

Haim Cohen, the owner of a furniture store in Philadelphia, testified Appellant was his employee for approximately 18 months before the shooting occurred; however, in early February 2014, Appellant stopped appearing for work and his telephone was disconnected. *Id.* at 143-44. Prior to failing to appear for work, Appellant had been "very good" at

communicating with Mr. Cohen. *Id.* at 143-46. On February 24, 2014, Detective Hartman spoke to Mr. Cohen, who informed the detective that he had not heard from or seen Appellant in two weeks. *Id.* at 145. When shown the surveillance video from the night of the shooting at the deli, Mr. Cohen identified Appellant as being in the video. *Id.* at 149-50.

Detective Ted Wolkiewicz testified that, on February 19, 2014, he was informed that Ahmad Kidd, who was in a holding cell due to his arrest on theft charges, asked to speak to a detective. N.T., 1/15/15/, at 25-27. Mr. Kidd was taken to an interview room, where Detective Wolkiewicz and Detective Craig Coulter interviewed him. *Id.* at 31-33. Detective Wolkiewicz indicated that Mr. Kidd gave the following statement:

> **Q[:]** What is your name?
> **A:** Ahmad Kidd.
> **Q:** You were arrested on theft charges yesterday; is that correct?
> **A:** Yes.
> **Q:** You told officers you had information on a shooting that took place on the 4800 block of North Broad Street in January of this year; is that correct?
> **A:** Yes.
> **Q:** Detective Coulter and I brought you up to an interview room. Do you still want to talk?
> **A:** Yes. I wanted to ask if it would help me for my theft.
> **Q:** Ahmad, I'm telling you I can't give you any help with any legal problem you have. That would be for your attorney to work it out with the district attorney's office. Do you understand?
> **A:** Okay. I was wondering.
> **Q:** Do you still want to discuss information about the shooting incident?
> **A:** Okay. I can tell you.
> **Q:** What do you want to say?

> **A:** I know about the shooting at Sunny's Deli on Broad Street.
> **Q[:]** There was an incident at 4838 North Broad Street on January 12, 2014, that was reported at about 12:09 a.m. It occurred outside of Sunny's Deli. Is that the incident?
> * * *
> **A:** Yes. Kevin shot a dude in the parking lot.
> **Q:** Before we proceed, I would like to show you a video from inside of the deli. Would you like to watch?
> **A:** Yes.

*Id.* at 34-36 (quotation marks omitted).

Detective Wolkiewicz testified that he, along with Detective Coulter and Detective Hartman, showed Mr. Kidd the surveillance video footage from Sunny's Deli. *Id.* at 37. Thereafter, Detective Wolkiewicz restarted the interview, and Mr. Kidd gave the following statement:

> **Q:** Ahmad, Detective Hartman just showed you video footage of the inside of Sunny's Deli. Did you get a good look?
> **A:** Yes. I seen [*sic*] me, then I seen [*sic*] Kev come in, then I saw Twan. Donny walked in too.
> **Q:** Did you recognize the first male who walked up while you were at the window?
> **A:** I know him because I sell a little weed sometimes. He bought weed from me. I don't know his name, but I know his brother. They both live on Carlisle Street.
> **Q:** You identified Kev as a male wearing the sweatshirt with a design on the front, is that right?
> **A:** Yes. That's definitely him.
> **Q:** The video shows Kev walk out the door immediately behind a male who was shot; is that right?
> **A:** Yes. You can see it's just a guy, then Kev.
> **Q:** How positive are you about the male being known to you as "Kev?" Are you positive it's him?
> **A:** Yes. You can see it's him. I know Kev for like ten years. I see him a lot. I see him all the time.
> **Q:** When did you last see Kev?
> **A:** This is Wednesday. I seen [*sic*] him, like Monday, two days ago.

**Q:** What would make you think Kev was responsible for shooting that man?

\*\*\*

**A:** About two days after, or maybe the very next day, I talked to Kev and he told me he shot the dude.

**Q:** Do you remember the conversation?

**A:** I said the cops was [*sic*] there and Pop, he owned the deli, told me they had a picture, but he wasn't there and didn't know anybody. I seen [*sic*] that, then I called Kev. I told him what Pop told me. Kev told me he wasn't playing. He said, 'I shot that motherfucker to protect mine.'

\*\*\*

**Q:** What does all that mean?

**A:** There had been a beef going on between Kev and his boys and Rell's older brother. His name might be Tommy. They live together on Loudon Street next to Twan.

**Q:** Who is Rell?

**A:** A guy who got shot in the lot. They told me his name [is] "Rill" or "Rell." I don't know him.

**Q:** You identified the man in the video as "Kev." Do you know him?

**A:** I don't know his name. I know him for ten years. I only know him as Kev.

**Q:** If I show you a photo, could you identify him?

**A:** That's him in the movie. I see him most every day.

*Id.* at 37-40 (quotation marks omitted).

Detective Wolkiewicz testified that, at this point, he showed Mr. Kidd numerous photographs, and the statement continued as follows:

**Q[:]** I'm showing you a photo. Do you know this person?

**A:** Yes. That's Kev. He's in the film and he's the one who told me he shot that guy.

**Q:** Is there any doubt?

**A:** You keep asking me. I know the guy. I see him all the time. In the movie when he walked up on me, he asked me if I'm cool. I was drinking that night. I told him I'm cool. And when we talked on the phone, I wasn't high or drunk, it was the next day.

**Q:** Did Kev tell you anything else about the actual shooting incident in that lot—in the lot?

- 8 -

**A:** No. He just said he shot the guy and he had to do it because of 15th Street. It was payback. He thanked me for letting him know the cops was [*sic*] around.

**Q:** Detective Coulter is showing you a photo. Do you know this person?

**A:** That's Donny. He['s] in the movie at the deli.

\*\*\*

**Q[:]** Why didn't you call the police after Kev told you he shot that man?

**A[:]** My mom and sisters live around there. I don't know what he [is] capable of doing. He could harm them or shoot them. I was afraid. When the cops asked me last night if I had any information, I changed my mind.

\*\*\*

**Q[:]** Detective Coulter is showing you a photo. Do you know this person?

**A[:]** That's Donny. He['s] in the movie at the deli.

\*\*\*

**Q[:]** Detective Coulter is showing you a photo. Do you know this person?

**A:** That's Rell. He [is] the boy who got shot. I didn't know he was the one who got shot that night.

**Q:** Detective Coulter is showing you a photo. Do you recognize this person?

**A:** That look[s] like the brother of Rell, I think. I don't really know him. He got his house shot up last year, same beef.

**Q:** Detective Coulter is showing you a photo. Do you recognize this person?

**A:** That's Twan, his name [is] Antwyone. I know him. He lived next door to Kev on Loudon Street. I was making a mistake when I told you Rell lived on Loudon Street. Rell and his brother, they live on Carlisle Street. It's Twan who lived next door to Kev's.

*Id.* at 41-45 (quotation marks omitted).

Detective Wolkiewicz noted that he typed the interview and requested Mr. Kidd review it for accuracy. *Id.* at 45. He then told Mr. Kidd he could sign it, make any changes, or even tear it up if he wished to do so. *Id.* at 46. Mr. Kidd signed and dated each page of the typed interview. *Id.*

Detective Wolkiewicz noted that, during the interview, Mr. Kidd did not appear to be under the influence and "there wasn't a thing wrong with the man." *Id.* at 29. He indicated Mr. Kidd was "calm and he. . .spoke like you would talk to somebody in a restaurant at a table. He was fine." *Id.* at 61.

Detective Wolkiewicz testified that, on March 27, 2014, he and Mr. Kidd were subpoenaed as witnesses for a grand jury, and prior to Mr. Kidd testifying at the grand jury, he gave him the typed, signed interview to review for accuracy. *Id.* at 49. Mr. Kidd never indicated he wished to make any changes. *Id.* at 49-50. Detective Wolkiewicz noted that Mr. Kidd was sober at the grand jury proceedings. *Id.* at 49-50.

Detective Coulter confirmed Detective Wolkiewicz's testimony regarding the circumstances surrounding Mr. Kidd's statement to the detectives on February 19, 2014. He noted he witnessed Mr. Kidd signing and dating the typed interview. *Id.* at 140-41. He further noted that no one made any promises to Mr. Kidd in exchange for the statement. *Id.* at 141.

Ahmad Kidd confirmed that he was placed in a holding cell following his arrest and asked to speak to a detective. *Id.* at 159. As confirmed by the surveillance videotape from Sunny's Deli, Mr. Kidd testified he was present at the deli on January 12, 2014. *Id.* at 159-60. Mr. Kidd testified he had consumed drugs and alcohol on the night of the shooting, and he was "probably" at the deli trying to sell marijuana. *Id.* at 160-61. He indicated

he worked at the deli and, in his free time, he spent a lot of time "hanging out" at the deli. *Id.* at 161-62. He admitted he had known Appellant for five or ten years. *Id.* at 163.

With regard to the typed statement, which bore his signature, Mr. Kidd testified the statement was "BS." *Id.* at 180. He denied giving the detectives any information about the shooting on the night of his arrest, and more specifically, he denied indicating "Kev" was involved. *Id.* at 181-97. He testified that he signed and dated the written statement just to get out of the room. *Id.* at 190.

Mr. Kidd admitted at trial that, prior to testifying at a grand jury on March 27, 2014, for the instant case, a detective showed him his written statement, and he indicated he needed to make no changes. *Id.* at 177-78, 201. Referring to the grand jury transcript, the prosecutor asked Mr. Kidd if he remembered testifying during the grand jury that there was a person in Sunny's Deli that had "[a] tiger or something" on his sweatshirt and the person wearing the sweatshirt was "Kev." *Id.* at 215-16. The prosecutor also asked Mr. Kidd if he remembered testifying at the grand jury that "Kev walked out behind [the victim]. . .[and] seconds, not even[,]" he heard the gunshots. *Id.* at 217, 219. Further, the prosecutor asked Mr. Kidd if he remembered testifying at the grand jury that two days after the shooting he had a telephone conversation with Kev, who told him "I had to take care of

mine. I handled it. I had to handle mine." *Id.* at 220-223. Mr. Kidd denied that he remembered his grand jury testimony.[2] *Id.* at 216-219.

On cross-examination, Mr. Kidd indicated he pled guilty to aggravated assault and burglary, and he is addicted to drugs. *Id.* at 232-34. He testified that he was intoxicated at the time of the shooting, and he does not "hang out" with Appellant. *Id.* at 233, 244. He also testified he has a lengthy criminal history. *Id.* at 258-59.

On redirect-examination, Mr. Kidd admitted that, when he testified before the grand jury on March 27, 2014, he was sober as he had been in jail since February 19, 2014. *Id.* at 273-74.

William Sheridan, a City of Philadelphia employee who provides community-based services, testified he provided services to Appellant, beginning in August 2012, and Appellant lived on Loudon Street. *Id.* at 83-84. He noted that Appellant was "punctual" and never missed a scheduled meeting. *Id.* at 83-92. He indicated the last time he met with Appellant

_____

[2] The prosecutor entered into evidence portions of Mr. Kidd's grand jury testimony, and the parties stipulated that, if called to testify, the stenographer would testify that the transcript adequately reflected Mr. Kidd's testimony given on March 27, 2014, before the grand jury. Relevantly, the grand jury transcript revealed Mr. Kidd testified that Appellant, to whom he referred to as "Kev," was at Sunny's Deli just before the shooting; Kev was wearing a sweatshirt decorated with a picture of a tiger; Kev left the deli behind the victim, and seconds later, Mr. Kidd heard gunshots; Mr. Kidd called Kev a few days after the shooting, at which time Kev said, "I had to take care of mine. I had to handle mine[;]" and Mr. Kidd interpreted this to mean Kev shot Mr. Autry due to a turf war with Mr. Autry's brother. N.T., 1/15/15, at 18-23.

was on February 19, 2014, and although scheduled to meet, Appellant failed to appear on March 5, 2014, without explanation. *Id.* at 87-92. He noted he had Appellant's telephone number and, when asked, he provided the number to Detective Hartman. *Id.* at 86. He further noted that Detective Hartman asked him to review video footage from January 12, 2014, and he identified Appellant as being in the video. *Id.* at 90-91.

Detective Edward Davis testified he prepared an application for a search warrant, indicating the police were looking for "[a] 9 millimeter handgun, ammunition, a dark-colored shirt with a tiger, and sunglasses. . .A T-Mobil cell phone, [with a particular phone number]; and a proof of residency." *Id.* at 157. The search warrant was executed on March 6, 2014, and Detective Davis seized the T-Mobil cell phone, which was listed on the warrant. *Id.* at 158.

Detective Hartman testified he seized the surveillance video from Sunny's Deli, which had eight active cameras, on the day of the shooting. *Id.* at 176-78. Detective Hartman noted the cameras showed portions of the interior of the deli, as well as exterior portions of the surrounding area. *Id.* at 184-85. Detective Hartman indicated one of the interior cameras showed the "gentleman with the tiger sweatshirt tapped or bumped another individual in the video and [ ] pointed at [a] person." *Id.* at 43. He continued that "[t]he individual that was being pointed at walked [ ] towards the exit of the store. The gentleman in the tiger sweatshirt, again, appears

to turn towards him and, again, points towards him, and then shortly after, the gentleman in the tiger sweatshirt follows him outside." *Id.* at 44. Detective Hartman noted the video showed "the gentleman with that tiger sweatshirt followed the other gentleman out of the store." *Id.* at 44-45.

He further testified:

> When I observed this video, what I appeared to see is the person that was being pointed at left the store, went northbound on Broad Street towards that parking lot, and turned into the parking lot.
> The person in the video with the tiger sweatshirt and wearing the sunglasses [ ] pointed at the gentleman who left the store, appeared to follow that gentleman out of the store, follow[ed] him northbound on Broad Street, and turned into-into the parking lot behind him.

*Id.* at 47.

Detective Hartman opined that, based on his review of the surveillance footage, "everybody [else] was accounted for that entered that lot." *Id.* at 48. That is, he testified based on what he observed on the videos, as well as his investigation, "nobody remained in that area that wasn't on camera prior to the victim—or prior to that gentleman walking into the lot and the person with the tiger sweatshirt following him into that lot." *Id.* at 50. He noted that the video showed Mr. Autry running towards Carlisle Street at the time of the gunshots, and the area from which the fired cartridges were recovered was in a "blind spot" of the cameras. *Id.* at 55. Detective Hartman testified the video showed that, after the gunshots ended, the person who followed Mr. Autry into the parking lot came out of the blind

spot. *Id.* at 55-56. Upon reviewing the video footage after the shooting, Detective Hartman concluded the gentleman wearing the blue sweatshirt with the tiger on it was the suspect in the shooting. *Id.* at 56.

Detective Hartman testified the back portion of the parking lot has an eight feet high chain link fence with barbed wire at the top. N.T., 1/16/15, at 12. He noted the deli's cameras did not cover this portion of the parking lot where the fence is located. *Id.* at 13.

Detective Hartman indicated that, on February 10, 2014, he released portions of the surveillance footage to the media, and it was placed on the police department's Facebook page, as well as the YouTube channel. *Id.* at 76. Further, Detective Hartman testified that, after the T-Mobile cell phone was seized from Appellant's home upon execution of the search warrant, he provided it to the FBI's Regional Computer Forensic Laboratory, which provided the police with a report regarding the downloaded contents of the cell phone. *Id.* at 112.

Regarding the report, Detective Hartman testified:

> **A:** Th[ere is a] portion of the report [that] has to do with YouTube application searches.
> **Q:** Okay. So YouTube application, that's if the YouTube app was actually on that phone?
> **A:** Correct.
> **Q:** Okay. And the information that was stored was what the person typed in to search in the YouTube app?
> **A:** Correct. These are searches made in the YouTube app.
> \*\*\*
> **Q:** Can you please read the date, the time, and the search that was conducted in the YouTube app?

- 15 -

**A:** Yes. The date and time is January 15th of 2014 at 9:16 and 22 seconds p.m., and that was the universal time. And this is the YouTube applications and it was a search of "shoot at Broad and Rockland."

**Q:** Detective, Rockland Street, where is that in reference to the deli?

**A:** Rockland Street is the first block north of the deli. . . Th[ere] is another search that was done in the YouTube app on 1/15 of '14 at 9:16 and 55 seconds p.m. universal time in the YouTube application, and the search was "shooting at Broad and Rockland."

**Q:** Detective, how many days after the shooting is 1/15?

**A:** About three.

**Q:** Had you released the video to the media yet?

**A:** I had not. . . .February 14th, 2014, at 8:23 and 42 seconds p.m. universal time. YouTube application search, "shooting at 4836 Broad Street."

**Q:** 4836 Broad Street. What's at that location?

**A:** That's the location of the deli. . . .February 14, 2014, at 8:20 and 33 seconds p.m. universal time. YouTube application, and the search was "aggravated assault on Broad Street."

**Q:** Now, Detective. . .do you recall what size fired cartridge casing the 15 fired cartridge casings were that were recovered in regard to this investigation?

**A:** Yes.

**Q:** What were they?

**A:** They were all 9 millimeter. . . .Th[ere] was a search done on 2/3/14 at 7:27 and 14 seconds p.m. universal time. Search in the YouTube application, "how to clean a MAC-10 9 millimeter."

*Id.* at 113-17.

At the conclusion of all testimony, the jury convicted Appellant of the offenses indicated *supra*, and he was sentenced to an aggregate of seventeen years to thirty-four years in prison. Appellant filed a timely,

counseled post-sentence motion, which the trial court denied. This timely appeal followed.[3]

Appellant's first claim is that the evidence was insufficient to sustain his convictions.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

---

[3] The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement, and Appellant filed a petition for an extension of time, which the trial court granted. The trial court directed Appellant to file his Pa.R.A.P. 1925(b) statement by December 31, 2015. On December 28, 2015, the trial court filed an opinion, raising and addressing various issues. On February 19, 2016, Appellant filed a counseled Pa.R.A.P. 1925(b) statement, presenting the same issues as was addressed by the trial court in its Rule 1925(a) opinion. To the extent Appellant's Pa.R.A.P. 1925(b) statement was filed late, we elect to proceed to review Appellant's issues since the trial court has addressed the issues in its Rule 1925(a) opinion. **See Commonwealth v. Growhowski**, 980 A.2d 113 (Pa.Super. 2009).

***Commonwealth v. Brooks***, 7 A.3d 852, 856-57 (Pa.Super. 2010) (citations omitted).

Here, Appellant's sufficiency argument is specific in nature. Specifically, he avers the evidence was insufficient to prove that he was, in fact, the person who committed the crimes. As such, we need not conduct a thorough review of the evidence to determine whether it can support a finding that all of the elements have been met. Rather, we will focus on the specific issue raised by Appellant: whether the evidence was sufficient to establish that Appellant was the perpetrator of the crimes.

In addressing Appellant's sufficiency of the evidence claim, the trial court indicated the following in its Rule 1925(a) opinion:

> [Appellant] told Kidd that he shot Autry out of revenge and to "protect" his drug turf. [Appellant's] statements demonstrated his consciousness of guilt[.] Further, although he was a frequent customer of "Sunny's Deli," [Appellant] never went back to the deli after the shooting. He also did not return to his job and stopped meeting with Sheridan after police released the video of the shooting. Finally, within days after the shooting, [Appellant] conducted YouTube searches related to how to clean a firearm of the same caliber as the [fired cartridge casings] recovered by police. He also conducted YouTube searches of the exact location of the shooting [before] the video was released to the public.
>    [Appellant's] identity was confirmed by Kidd, Sarith To, and Sheridan who each positively identified [Appellant] as the person wearing the tiger sweatshirt on the video. By finding [Appellant] guilty, the jury determined that Kidd's statement to [the] police and his grand jury testimony were credible. In his statement and grand jury testimony, Kidd identified [Appellant] as the person in the tiger sweatshirt in the deli on the night of the shooting. He further stated that he knew [Appellant] for almost 10 years and that [Appellant] admitted during a phone conversation that he shot Autry. Kidd also explained the motive

for [Appellant] shooting at Autry. As such, there is no basis to disturb the jury's credibility determination notwithstanding the substantial lines of impeachment and potential bias that were the focus of Kidd's cross-examination.

Detective Hartman's compilation video shows [Appellant] followed Autry out of the deli and into the parking lot. Seconds later, several gunshots were fired and heard in the video. The video showed Autry running toward Carlisle Street while the gunshots were fired. The camera had a "blind spot" at the center of the lot, exactly where 15 MAC-10 9 millimeter bullet casings were recovered. Following the gunshots, [Appellant] emerged from the blind spot and exited the parking lot. Although there is a "blind spot" in the video of the parking lot, Detective Hartman testified extensively about how the eight videos would have captured any person or vehicle that entered or exited the parking lot at the time of the shooting; the actual video only showed two people entering and exiting the parking lot at the time of the shooting: Autry and [Appellant]. Detective Hartman also testified that it was impossible for any person to enter or exit the parking lot other than from the sidewalk on Broad Street or Carlisle Street. Finally, police officers who secured the scene immediately after the shooting testified that no one was hiding inside or under any of the vehicles in the parking lot.

Trial Court Pa.R.A.P. 1925(a) Opinion, filed 12/28/15, at 17-18 (citation omitted).

We agree with the trial court's analysis in this regard and, applying the requisite standard of review, we conclude the evidence was sufficient to establish Appellant was the person who shot Mr. Autry. **See Brooks**, **supra**.

We acknowledge, as Appellant points out on appeal, that the Commonwealth offered no witness or video footage of Appellant actually shooting at Autry, and thus, the evidence supporting Appellant's identity as the perpetrator was circumstantial. However, as our Supreme Court has

- 19 -

held, "circumstantial evidence is sufficient to sustain a conviction so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." **Commonwealth v. Chambers**, 528 Pa. 558, 599 A.2d 630, 635 (1991) (quotation and quotation marks omitted). Simply put, the evidence was sufficient to prove Appellant shot Mr. Autry.

Appellant's next claim is the jury's verdict is against the weight of the evidence. More specifically he alleges the Commonwealth's case-in-chief relied "heavily" on the testimony of Mr. Kidd, who was not credible. The Commonwealth advocates waiver of this claim and, for the reasons set forth *infra*, we agree Appellant has waived the claim for appellate review.

"[I]t is well settled that this Court cannot entertain, in the first instance, a request for a new trial based upon a claim that the verdict is against the weight of the evidence." **Commonwealth v. Holley**, 945 A.2d 241, 245-46 (Pa.Super. 2008); Pa.R.Crim.P. 607(A). Rather, a challenge to the weight of the evidence must be presented "(1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion." Pa.R.Crim.P. 607(A). Moreover, presenting a challenge to the weight of the evidence for the first time in a Rule 1925(b) statement does not preserve the issue for appellate review, even in instances where the trial court addresses the merits of the claim in its Rule 1925(a) opinion. **See Commonwealth v. Burkett**, 830 A.2d 1034 (Pa.Super. 2003).

Here, while Appellant filed a timely post-sentence motion, he did not include therein a weight of the evidence claim. Moreover, he did not raise the issue orally or by written motion before sentencing. Accordingly, he has waived his challenge to the weight of the evidence. Pa.R.Crim.P. 607(A).

Appellant's final claim is the trial court erred in admitting evidence regarding Appellant's YouTube searches, as well as Detective Hartman's narration of the searches.[4] Specifically, Appellant contends the evidence should have been excluded under Pa.R.E. 403.

Initially, we note that the "[a]dmission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Tyson*, 119 A.3d 353, 357-58 (Pa.Super. 2015) (*en banc*) (quotations and quotation marks omitted). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Harris*, 884 A.2d 920, 924 (Pa.Super. 2005).

Pursuant to Pa.R.E. 403, "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the

---

[4] We note the record reflects Appellant properly objected to the evidence and narration at trial. N.T., 1/16/15, at 118.

following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

In the case *sub judice*, Appellant does not dispute that the evidence of his YouTube searches, as well as Detective Hartman's narration of the searches, was relevant. **See** Appellant's Brief at 25. Rather, he baldly asserts "its probative value is far outweighed by the danger of unfair prejudice and misleading the jury." Appellant's Brief at 25. Aside from this bald assertion, however, Appellant has not developed his argument further. His argument, spanning less than one page, does not permit meaningful review, and we decline to develop the argument for Appellant. **Commonwealth v. Kane**, 10 A.3d 327 (Pa.Super. 2010). Accordingly, his issue is waived on this basis. **See** Pa.R.A.P. 2119.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/9/2016

- 22 -