**COMMONWEALTH of Pennsylvania**

**v.**

**Eric HOLLEY, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 2, 2007.
Filed March 19, 2008.

Earl D. Raynor, Philadelphia, for appellant.

Hugh J. Burns, Jr., Asst. Dist. Atty., Philadelphia, for the Com., appellee.

BEFORE: JOYCE,* PANELLA, and KELLY, JJ.

OPINION BY PANELLA, J.:

¶ 1 Appellant, Eric Holley, appeals from the judgment of sentence entered on November 17, 2005, by the Honorable Anthony J. DeFino, Court of Common Pleas of Philadelphia County. After a thorough review of the record, we affirm.

¶ 2 This Court's memorandum of March 22, 2007, set forth the relevant facts of this case as follows:

The facts underlying the instant case concern an incident occurring on April 22, 2004 at approximately 9 a.m. at Frankford Hospital in the City and County of Philadelphia. The complainant, Alice Govozdean, was working as a correctional officer at the Philadelphia prison. The complainant and her partner, Maurice Kennedy, were assigned to Frankford Hospital to secure [Holley], an admitted inmate at the hospital. A few hours after their arrival, Officer Kennedy took a break, leaving the complainant to watch over [Holley] by herself. A few minutes later, [Holley] informed the complainant that he needed to use the bathroom. The complainant, granting the request, unshackled [Holley]'s right ankle from the bed. As the complainant moved to re-shackle his right ankle to his left ankle, [Holley] suddenly struck her on the side of her head, knocking her to the wall. The complainant then punched [Holley] twice, threw a chair in front of him, and ran out to the hallway. [Holley] chased after her and wrestled her to the floor. The complainant testified that as they were struggling on the floor, she felt [Holley] reach for her gun.

The complainant attempted to protect her weapon by laying on her side while simultaneously kicking and punching [Holley], however, [Holley] eventually gained control of the gun. Testimony from both the complainant and a witness, Gabriella Campbell, revealed that [Holley], who was inches away, then pointed the gun at the complainant and fired once. Additionally, another witness, Jennifer DiPasquale, testified that she saw [Holley] point the gun towards the complainant's head saying, "you're going to die, bitch."

From down the hall, Brian Mort, an employee at the hospital, heard the commotion and decided to investigate the matter. He discovered the complainant and [Holley] wrestling on the ground, with [Holley] holding the gun and the complainant struggling to take it. Mr.

* Judge Joyce did not participate in the consideration or decision of this case.

Mort then lunged at [Holley], tackled him around the waist, and attempted to subdue him. Amidst the struggle, [Holley] discharged the weapon two more times. [Holley] was subsequently restrained and the gun taken from him. Around 9:50 a.m., detectives arrived at the scene to investigate the shooting. [Holley] gave a formal statement admitting that he tried to shoot the complainant adding, "And, damn, I missed." [Holley] read and signed his statement upon its completion.

On the second day of deliberations following a jury trial held on September 20–21, 2005, [Holley] was convicted of one count each of attempted murder[1] and aggravated assault.[2] On November 17, 2005, he was sentenced to six and a half to fifteen years' imprisonment. No post-sentence motions were filed. After a timely appeal was filed with this Court, the trial court ordered the filing of a statement of matters complained of on appeal pursuant to Pa.R.A.P. § 1925(b). Appellant complied.[ ]

Superior Court Memorandum Decision, 3/22/07, at 1–2 (internal citations omitted).

¶ 3 On March 22, 2007, a panel of this Court affirmed, finding that all of Holley's issues were waived based upon his failure to file a copy of the certified transcript on appeal. Holley filed a timely petition for allowance of appeal with the Supreme Court of Pennsylvania. On September 4, 2007, the Supreme Court granted said application, vacated the March 22, 2007 decision, and remanded the matter back for either an evidentiary hearing to determine the responsibility for the absence of trial transcripts and/or a decision on the merits of those issues that were preserved for appeal. On November 29, 2007, the Commonwealth filed a motion to correct omission in the record by submitting a copy of the trial transcript.[3] We granted that motion on December 4, 2007.

¶ 4 On appeal, Holley raises three issues for our review:

Whether the jury's verdict, finding [Holley] guilty of Attempted Murder (FI) and Aggravated Assault (FI), was against the weight of the evidence?

Whether there was insufficient evidence to support the jury's verdict, finding Appellant guilty of Attempted Murder (FI) and Aggravated Assault (F2)?

Whether the trial court erred in denying Appellant's motion for a mistrial, where Commonwealth [sic] engaged in prosecutorial misconduct, by calling Appellant's expert witness "arrogant and clueless," and Appellant's trial counsel "insane," thereby creating a fixed bias in minds [sic] of jurors, which prejudiced [Holley]'s right to a fair trial?

Appellant's Brief, at 12.

¶ 5 Holley argues that the verdict was against the weight of the evidence. However, Holley has failed to preserve this argument for our review. It is well settled that this Court cannot entertain, in the first instance, a request for a new trial based upon a claim that the

1. 18 PA. CONS.STAT. ANN. § 2502.

2. 18 PA. CONS.STAT. ANN. § 2702.

3. We note that the transcripts submitted by both the Commonwealth and the trial court contain an identical error. On page 172 of the transcript for September 20, 2005, the transcript skips from the middle of the direct examination of Officer McKenzie to the beginning of the direct examination of Diane Rack, omitting the remainder of Officer's McKenzie's direct examination, the cross examination, and the testimony of any witnesses that testified between Officer McKenzie and Ms. Rack. Despite this, we have decided to review this matter, as the transcripts are sufficiently complete to address the merits of Holley's claims.

verdict is against the weight of the evidence. *Commonwealth v. Mack,* 850 A.2d 690, 694 (Pa.Super.2004) (failure to raise a challenge to the weight of the evidence in compliance with Pa.R.Crim.P., Rule 607, 42 Pa. Cons.Stat. Ann., constitutes a waiver of the weight claim, even if the trial court addresses the claim on the merits). Here, Appellant failed to make an oral motion on the record prior to sentencing and also failed to file a post-sentence motion raising this issue. *See* Pa.R.Crim.P., Rule 607, 42 Pa. Cons.Stat. Ann.; *Commonwealth v. O'Black,* 897 A.2d 1234, 1239 (Pa.Super.2006). Thus, the issue is not preserved for our review.

¶ 6 We note that Appellant has attached to his brief what purports to be a copy of a motion for reconsideration, and an order denying it, which raised the weight of the evidence claim. However, neither the motion nor the order are listed in the docket, nor are they a part of the certified record. It is well settled that, "[f]or purposes of appellate review, what is not of record does not exist." *Rosselli v. Rosselli,* 750 A.2d 355, 359 (Pa.Super.2000), *appeal denied,* 564 Pa. 696, 764 A.2d 50 (2000) (Table); *see* Pa.R.A.P., Rule 302, 42 Pa. Cons.Stat. Ann. Further, this Court has regularly stated that copying material and attaching it to a brief does not make it a part of the certified record. *See, e.g., Lundy v. Manchel,* 865 A.2d 850, 855 (Pa.Super.2004); *First Union Nat. Bank v. F.A. Realty Investors Corp.,* 812 A.2d 719, 724 n. 3 (Pa.Super.2002). Accordingly, we find that Holley's weight of

the evidence claim is not properly preserved for our review.

¶ 7 Furthermore, even if we were empowered to review the claim on the merits, Holley would not prevail. The essence of his argument is that the jury should have accepted the testimony of his witnesses and that of those Commonwealth witnesses he believed were more favorable to his version of the events. However, the finder of fact was free to believe the testimony of the Commonwealth witnesses who testified that Holley deliberately aimed the gun and shot at Alice Govozdean before he was tackled by Brian Mort, as well as Holley's own statement that he intended to shoot her. The jury was also free to disregard the testimony of Holley's expert witness given the fact that he had relied on inaccurate factual information in forming his diagnosis. *See Commonwealth v. Davido,* 582 Pa. 52, 71 n. 18, 868 A.2d 431, 442 n. 18 (2005), *cert. denied,* 546 U.S. 1020, 126 S.Ct. 660, 163 L.Ed.2d 534 (2005).[4]

¶ 8 Holley next argues that the evidence was insufficient to sustain his convictions for attempted murder and aggravated assault. The standard for reviewing the sufficiency of evidence on appeal is well-settled.

When reviewing a sufficiency of the evidence claim, an appellate court must view all the evidence and reasonable inferences therefrom in a light most favorable to the Commonwealth as verdict winner and must determine whether the evidence was such as to enable a fact finder to find that all of the elements of

---

**4.** In *Davido,* our Supreme Court stated:
The weight of the evidence is exclusively for the finder of fact, which is free to believe all, part, or none of the evidence, and to assess the credibility of the witnesses. *Commonwealth v. DeJesus,* 580 Pa. 303, 310–312, 860 A.2d 102, 107–108, 2004 WL 2363726, *3 (Pa.2004). "Questions con-

cerning inconsistent testimony and improper motive go to the credibility of the witnesses." *Id.* To the extent that Appellant is challenging the weight of the medical evidence, this court will not substitute its judgment for the finder of fact.
582 Pa. at 71 n. 18, 868 A.2d at 442 n. 18.

the offense[ ] were established beyond a reasonable doubt.

*Commonwealth v. Castelhun,* 889 A.2d 1228, 1232 (Pa.Super.2005) (internal citations omitted). Moreover, when reviewing the sufficiency of the evidence, this Court may not substitute its judgment for that of the fact-finder; if the record contains support for the convictions they may not be disturbed. *Commonwealth v. Hartle,* 894 A.2d 800, 803 (Pa.Super.2006). Lastly, the finder of fact may believe all, some or none of a witness's testimony. *Castelhun,* 889 A.2d at 1232.

▮ ¶ 9 An individual is guilty of attempted murder in the first degree if he commits an act that is a substantial step towards the commission of the crime with a specific intent to kill. *See* 18 PA. CONS. STAT. ANN. §§ 901; 2502(a). Similarly, an individual is guilty of aggravated assault if he:

(1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;

\* \* \*

(4) attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon[.]

18 PA. CONS.STAT. ANN. § 2702(a)(1) and (4).

▮ ¶ 10 We have defined "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 PA. CONS.STAT. ANN. § 2301. In order to sustain a conviction for aggravated assault, the Commonwealth does not have to prove that the serious bodily injury was actually inflicted but rather that the Appellant acted with the specific intent to cause such

injury. *Commonwealth v. Lewis,* 911 A.2d 558, 564 (Pa.Super.2006). Further,

[w]here the victim does not sustain serious bodily injury, the Commonwealth must prove that the appellant acted with specific intent to cause serious bodily injury. The Commonwealth may prove intent to cause serious bodily injury by circumstantial evidence. In determining whether the Commonwealth proved the Appellant had the requisite specific intent, the fact-finder is free to conclude the accused intended the natural and probable consequences of his actions to result therefrom. A determination of whether an appellant acted with intent to cause serious bodily injury must be determined on a case-by-case basis.

An intent is a subjective frame of mind, it is of necessity difficult of direct proof[.] We must look to all the evidence to establish intent, including, but not limited to, appellant's conduct as it appeared to his eyes[.] Intent can be proven by direct or circumstantial evidence; it may be inferred from acts or conduct or from the attendant circumstances. Moreover, depending on the circumstances even a single punch may be sufficient.

*Id.* (internal citations and quotations omitted).

▮ ¶ 11 Lastly,

(m)alice is a crucial element of aggravated assault, and is established when there is a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. Where malice is based on a reckless disregard of consequences, it must be shown that the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury; at the very least,

the conduct must be such that one could reasonably anticipate death or that serious bodily injury would likely and logically result.

*Commonwealth v. McClendon,* 874 A.2d 1223, 1229 (Pa.Super.2005) (internal citations, quotations, and emphases omitted).

¶ 12 At trial, Corrections Officer Govozdean testified that, after her male partner left the room on a break, Holley told her he needed to use the bathroom.[5] While she was unshackling Holley, he hit her on the head, knocking her into the wall. She attempted to restrain him and prevent him from leaving the room by throwing a chair in front of him. However, Holley followed her into the hallway and wrestled her to ground. He commenced hitting and punching her, while trying to obtain her gun. Holley was ultimately able to unholster Govozdean's weapon, which he then pointed at her chest and fired. As a result of the incident, Govozdean suffered a torn rotator cuff, other shoulder injuries, a black eye, and post-traumatic stress disorder. She has been unable to work since the incident.

¶ 13 Gabriella Campbell,[6] a nurse working in the telemetry unit at Frankford Hospital, testified that she observed Holley wrestling the guard down, punching her in the face, and trying the reach for her gun. Campbell testified that Holley was astride Govozdean when he raised the gun and pointed it at Govozdean, she then heard a shot go off. Following this shot, she saw Orderly Brian Mort tackle Holley and heard the gun go off twice more.

¶ 14 Brian Mort[7] testified that he was escorting a patient back to his room when he heard a crash and observed that Holley had Govozdean on the ground and that he had her gun. He stated that he tackled Holley and that Holley was trying to aim the gun at Govozdean while Mort tried to force it towards the wall. Mort stated that during this struggle, the gun went off at least three times.

¶ 15 Diane Rack,[8] a clerk at Frankford Hospital, testified that she heard other staff screaming, turned, and observed Govozdean struggling with Holley. Rack testified that Holley was on top of Govozdean and she heard other staff members screaming, "watch that gun." Rack testified that she heard one shot, and then there was a pause of several seconds before she heard two other shots. Rack further testified that she believed that the first shot did not occur until after Mort tackled Holley.

¶ 16 Blanca Martir,[9] another Frankford employee, testified that she heard screaming and saw Govozdean struggling with Holley. She testified that she observed Holley hitting Govozdean and trying to get her gun. Martir observed Holley grab the gun, however, because she then ran and hid, she did not see if he shot the gun. Martir heard three shots with a three-to-five second pause between each shot. Martir also believed that the first shot took place after Mort tackled Holley.

¶ 17 Nurse Jennifer DiPasquale,[10] who was standing closest to the altercation, testified that she saw Holley push Govozdean out of his hospital room. DiPasquale then saw Holley push Govozdean into a supply cart so hard that her head made a sound "like a bowling ball hitting the

---

5. N.T. 9/20/05 pp. 17–49.

6. N.T. 9/20/05 pp. 75–90.

7. *Id.* at pp. 50–74.

8. *Id.* at pp. 172–77.

9. *Id.* at pp. 178–88.

10. N.T. 9/21/05 at pp. 2–19.

floor." She saw Holley straddle Govozdean, heard him say "you're going to die, bitch," then saw him point a gun at Govozdean's head and fire. She testified, unequivocally, that the first shot was fired prior to Mort's tackling Holley and that the tackle did not cause Holley to shoot the gun.

¶ 18 Lastly, Detective Richard Flynn [11] testified that Holley gave a four-page statement. Detective Flynn stated that when asked if he intended to shoot someone, Holley replied, "yes, I did, and damn I missed."

¶ 19 This evidence is more than sufficient to sustain Holley's convictions for attempted murder and aggravated assault. Each of the eyewitnesses testified that Holley was fighting Govozdean, that he had her on the ground, was straddling her, and was trying to unholster her gun. Govozdean, Campbell, and DiPasquale all testified that Holley pointed the gun directly at Govozdean's upper chest/head area and fired. DiPasquale, who was the eyewitness standing closest to the struggle, testified that she heard Holley say, "you're going to die, bitch." Mort testified that he did not believe that the first shot went off until after he tackled Holley but specifically noted that Holley was trying to aim the gun at Govozdean while Mort tried to force it away. While witnesses Rack and Martir testified that the first shot did not go off until after Mort tackled Holley, their testimony was equivocal on this point, as both initially testified that the first shot took place prior to the tackle, then, when confronted with prior statements saying the opposite, stated that they "believed" the first shot happened after the tackle.

¶ 20 It was well within the province of the finder of fact to infer from Holley's

action in wrestling Officer Govozdean to the ground, successfully unholstering her gun, pointing it directly at her, and firing, that he had taken a substantial step towards deliberately killing her, particularly in light of DiPasquale's testimony that Holley told Govozdean she was going to die, and Holley's own statement to Detective Flynn that he intended to shoot Govozdean and that he was sorry he missed. Further, it was equally within the jury's province to determine that, regardless of whether the first shot took place before or after the tackle by Mort, when a prisoner attacks his guard, throws her to floor, obtains her gun, and points it at her and shoots, while in a crowded hospital hallway, that he is both acting with malice and intends to cause serious bodily injury while using a deadly weapon. *See Commonwealth v. Faulk*, 928 A.2d 1061, 1070–71 (Pa.Super.2007) (fact-finder is free to conclude the accused intended the natural and probable consequences of his actions).

¶ 21 Further, Holley's contention involves the same argument that he made in support of his weight of the evidence claim, that the finder of fact should have credited his insanity defense and/or believed the testimony of those prosecution witnesses that Holley believes were more favorable to his version of the events. However, particularly in light of the devastating cross-examination conducted of Holley's expert witness, Dr. Cooke,[12] the jury was within their rights to disbelieve Holley's insanity defense and credit the testimony of the eyewitnesses. Accordingly, we find Holley's sufficiency of the evidence claim to be without merit.

¶ 22 Holley's last argument is that his conviction should be reversed because the prosecutor engaged in prosecutorial

---

11. N.T. 9/20/05 at pp. 91–130.

12. N.T. 9/21/05 at pp. 81–120. Dr. Cooke's testimony will be more fully addressed below.

misconduct during closing.[13]   During closing argument, the Commonwealth made the following statements:

> Doctor Cooke, you know, he combines the arrogance of an expert witness with just a bit of cluelessness.
>
> * * *
>
> So, what are we left with?  Mr. Raynor has also accused me of basically a conspiracy against his client
>
> * * *
>
> that I somehow hid Ms. DiPasquale yesterday and then presented her in court for some nefarious reason, even though Ms. DiPasquale has never met his client, and, again, has no interest in this case. She was a nurse on the floor, and she was interviewed by the police.
>
> He knew about Ms. DiPasquale because her name was in the police paperwork. I found her and interviewed her.  You know why she was not here today?  Because she was taking a test.  Because her personal life interfered with her coming to court.   I tried to get her yesterday.  She couldn't make it until today because she was taking a test. So, that's the grand conspiracy of which I am the ring leader, I am the mastermind.  And I got Jennifer DiPasquale go along with it.
>
> I'm not sure who the insane one is here, Mr. Raynor or his client.

N.T. 9/21/05 at pp. 186–91.  Holley argues that the comment about Dr. Cooke and the statement that defense counsel was insane constituted prosecutorial misconduct.

¶ 23 It is well settled that a prosecutor has considerable latitude during closing arguments and his arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence.  *Commonwealth v. Paddy*, 569 Pa. 47, 82–83, 800 A.2d 294, 316 (2002).  Further, prosecutorial misconduct does not take place unless the "unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict."  *Id.* Prosecutorial misconduct is evaluated under a harmless error standard.  *Commonwealth v. Cousar*, 593 Pa. 204, 233, 928 A.2d 1025, 1042 (2007).  While a prosecutor cannot not offer his views as to a defense strategy, he can fairly respond to attacks on a witness's credibility.  *Commonwealth v. Williams*, 581 Pa. 57, 863 A.2d 505, 518 (2004).

¶ 24 Holley argues that the prosecutor's statement about Dr. Cooke constituted prosecutorial misconduct.   At trial, Dr. Cooke testified at length that the underlying basis of his conclusion that the Holley was legally insane at the time of the attack on Officer Govozdean was his opinion that Holley suffered from post-traumatic stress disorder ("PTSD") as a result of being present during the 1983 bombing of the United States Marine barracks in Beirut, Lebanon.[14]   Dr. Cooke further testified that Holley had been suffering from paranoid delusions for several weeks.   He based this conclusion upon Holley's statement to him that, when he was arrested

---

**13.**  While Holley states in his statement of questions presented that the trial court erred in denying his motion for a mistrial based upon prosecutorial misconduct, he does not cite to any portion of the record that contains a motion for mistrial and does not reference the standard of review for denying a motion

for a mistrial.   Further, to the extent he is referring to his motion for reconsideration, as discussed above, that motion is not part of the certified record and, therefore, will not be considered in this appeal.

**14.**  N.T. 9/21/05 at 34–120.

for gun possession on April 3, 2004, he was carrying a gun because Iraq had invaded northwest Philadelphia.

¶ 25 During cross-examination, Dr. Cooke admitted that he had taken Holley's word with respect to these statements and had not conducted any further factual investigation. When confronted with the fact that Holley had not been present during the Beirut bombings but rather had been serving as a drill sergeant at a Marine base in California, Dr. Cooke did not alter his opinion. Further, when confronted with Holley's statement to the police, that, at the time of his arrest, he was carrying a gun for protection because he had been in a bar fight the night before, a statement supported by the fact that Holley had a visible black eye in his mug shot, Dr. Cooke refused to admit that this might have any bearing on his diagnosis. Ultimately, Dr. Cooke stated that, while Holley might have tricked him about the underlying facts, he could not trick him about his mental state. Dr. Cooke continued to insist that Holley suffered from PTSD and that he had been having paranoid delusions about invading Iraqis.

¶ 26 In his closing argument, defense counsel characterized Dr. Cooke's testimony as "forthright" and "credible," his examination of Holley as "extensive" and "detailed," noted that Dr. Cooke gathered "biographical information," and concluded that his evaluation was "impressive." [15] Certainly, it was a fair response by the prosecutor to remind the jury that Holley's expert witness had failed to independently verify, or to verify in any way, the biographical information provided by Holley. It was also a fair response to remind the jury that when confronted with the reality that he had based much of his diagnosis of Holley on misinformation, Dr. Cooke re-fused to change his diagnosis. A prosecutor could reasonably argue that an expert on criminal insanity who fails to independently verify the very facts upon which he is basing his diagnosis and is unwilling to change his diagnosis when he learns that his client intentionally provided him with false information, is both "arrogant" and somewhat "clueless." Given this context, we find the prosecutor's statement to be permissible, and justifiable, oratorical flair, which did not form a fixed bias or hostility in the minds of the jury toward Holley. *See Commonwealth v. Hawkins,* 549 Pa. 352, 387–388, 701 A.2d 492, 510–511 (1997), *cert. denied,* 523 U.S. 1083, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998) (finding prosecutor's remarks during closing that Appellant's scientific expert's methods were sloppy did not constitute prosecutorial misconduct).

¶ 27 Holley next argues that the prosecutor's remark "I'm not sure who the insane one is here, Mr. Raynor or his client" constituted prosecutorial misconduct. Given the context in which this statement was made, we disagree.

¶ 28 During closing argument, defense counsel attempted to discredit Ms. DiPasquale by arguing at length about the timing of her testimony and the reasons the prosecutor presented her testimony out of order, after he had excused all the other prosecution witnesses. [16] Defense counsel stressed that the prosecution had excused his other eyewitnesses prior to Ms. DiPasquale's testimony and thus they could not be recalled to rebut her testimony; that he never received a copy of any statement made by Ms. DiPasquale prior to her testimony; that she did not testify at the preliminary hearing; and that she did not give a statement to the detectives at the

---

**15.** N.T. 9/21/05 at 173–75.

**16.** N.T. 9/21/05 at 170–72.

scene of the crime. Defense counsel referred to Ms. DiPasquale's testimony as "damning" to his client and then stated:

> Why was this testimony offered after all these people had been excused? I will tell you why. Because the prosecution knew full well that my client never said, "I'm going to shoot you, bitch." The prosecution knew full well that my client never pointed a gun at Officer Govozdean's head.

N.T. at pp. 171–72. Given that defense counsel had both accused a key prosecution witness of lying and essentially accused the prosecution of conspiring with her and suborning perjury, the prosecution's comments, when taken in context, were a fair and understandable response.[17]

¶ 29 During his closing, the prosecutor noted defense counsel's comments then offered an explanation of both his actions and Ms. DiPasquale's actions. The prosecutor noted that the police had received a statement from Ms. DiPasquale; that she had no personal interest in the case; that her name was listed in the police reports turned over to the defense; and that there was a simple reason that Ms. DiPasquale had testified a day later than the other prosecution witnesses, because she was unavailable the day before due to taking a test.[18] The prosecutor then stated, "that's the grand conspiracy of which I am the ring leader, I am the mastermind. And I got Jennifer DiPasquale go along with it. I'm not sure who the insane one is here, Mr. Raynor or his client." The prosecutor's statements were not a comment on Holley's guilt or innocence or a personal attack on defense counsel in general, rather they constituted a specific reference to defense counsel's accusations that the prosecution conspired with a witness to induce perjury. *See e.g., Commonwealth v. Faulkner,* 528 Pa. 57, 77, 595 A.2d 28, 39 (1991), *cert. denied,* 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992) (prosecutor's comments that defense counsel was "stupid" and that his conduct was "outrageous" did not prejudice the jury); *Commonwealth v. D'Amato,* 514 Pa. 471, 498–99, 526 A.2d 300, 313–14 (1987) (no prejudice when prosecutor spoke of the "web of deceit and self-contradiction that you're offered by the defense"). Accordingly, we find that the prosecutor's remarks did not so prejudice or inflame the mind of the jury so as to warrant the grant of a new trial.

¶ 30 Judgment of sentence affirmed. Jurisdiction relinquished.

---

17. The Pennsylvania Supreme Court has long held that "as long as there is a reasonable basis in the record for the comments, [it] will permit vigorous prosecutorial advocacy." *Commonwealth v. Miles,* 545 Pa. 500, 514, 681 A.2d 1295, 1302 (1996), *cert. denied,* 520 U.S. 1187, 117 S.Ct. 1472, 137 L.Ed.2d 684 (1997).

18. At trial, Ms. DiPasquale testified that she had, in fact, given a statement at the crime scene but it was to investigators from the prison rather than to the police detectives at the scene. N.T. 9/21/05 at 11–13.