J-S08038-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| KIMMY X. WONG | : | |
| | : | |
| Appellant | : | No. 3884 EDA 2017 |

Appeal from the Judgment of Sentence August 18, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0008960-2012,
CP-51-CR-0008961-2012

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED MARCH 07, 2019**

Appellant, Kimmy X. Wong, appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following his conviction by a jury on two counts of attempted murder in the first degree, two counts of aggravated assault, two counts of robbery, one count of firearms not to be carried without a license, one count of firearms not to be carried on the streets of Philadelphia, and one count of possession of an instrument of crime, as well as his conviction in a non-jury trial on the charge of possession of a firearm prohibited.[1]  After a careful review, we affirm.

---

[1] 18 Pa.C.S.A. §§ 901(a), 2702(a), 3701, 6106(a)(1), 6108, 907(a), and 6105(a)(1), respectively.

---

*   Former Justice specially assigned to the Superior Court.

The relevant facts and procedural history are as follows: On June 13, 2012, Appellant was arrested, and he was charged with various crimes at two separate lower court docket numbers. For the charges docketed at CP-51-CR-0008960-2012, the Commonwealth listed Phillip Holland as the victim, and for the charges docketed at CP-51-CR-0008961-2012, the Commonwealth listed Jerel Livingston as the victim.

On June 1, 2017, Appellant, who was represented by counsel, proceeded to a jury trial. At trial, Philadelphia Police Officer Kenneth Sherard testified that, on June 13, 2012, at approximately 5:20 p.m., he was on patrol and received a radio call of shots fired near an apartment complex in the 8400 block of Lindbergh Boulevard. N.T., 6/1/17, at 48. Subsequently, he received another radio call for a shooting at the 8400 block of Lyons Avenue near the Pepper Middle School. *Id.* at 49-50. At this point, the police were not sure how, or if, the two shootings were related. *Id.*

Officer Sherard testified that, upon arrival at the Lindbergh Boulevard location, he saw a black male, with an apparent gunshot wound to his forehead, lying on the sidewalk outside of an apartment building. *Id.* at 53. Officer Sherard secured the location and observed several shell casings on the ground. *Id.* at 57. The deceased shooting victim was later identified as Terrell Brown. *Id.*

Philadelphia Police Officer Torin Saunders testified that, on the day in question, he was on duty and received a radio transmission directing him to

- 2 -

the 8400 block of Lindbergh Boulevard. *Id.* at 79-80. He and his partner traveled immediately to the location, gathered information, and then, based on subsequent "flash" information[2] regarding the description of a suspect, began surveying the surrounding area. *Id.* Officer Saunders testified that, as he and his partner were driving around the Penrose Plaza shopping center, Officer Saunders noticed Appellant, who fit the description provided in the flash information, talking on a cell phone. *Id.* at 82. Appellant looked at the police car, "stepped a few feet back to a big brick pillar[,] and [stood] behind it." *Id.* Officer Saunders informed his partner, who was driving, that he saw a suspect matching the description standing behind the pillar. *Id.* At this point, Appellant "peeked out" and "right real quick" entered the Jamaican Way store. *Id.* at 82, 86.

Officer Saunders testified his partner made a U-turn, the officers parked the police vehicle away from the store, and they entered the store with their guns drawn. *Id.* at 83. As soon as Officer Saunders entered the store, he saw Appellant leaning against the counter and talking on a cell phone. *Id.* Appellant stood up and took a step back, but he then walked towards the officers. *Id.* The officers instructed Appellant to show them his hands and lie on the ground. *Id.* A quick pat-down of Appellant's person revealed no gun;

_____

[2] "[F]lash information is based on a report from the initial officers to investigate the scene of a crime and is broadcast to other police units in the district." ***Commonwealth v. Jackson***, 519 A.2d 427, 431 (Pa.Super. 1986).

however, a store employee directed the officers to a nearby trash can where they discovered a handgun inside. *Id.* at 90-91. Officer Saunders testified he was later present when complainants positively identified Appellant. *Id.* at 91.

Jerel Livingston testified that, on the day in question, he and his teenage stepson, Phillip Holland, arrived at the Pepper Middle School parking lot at approximately 4:50 p.m. to practice driving. N.T., 6/2/17, at 7-8. After about thirteen minutes of his stepson driving, Mr. Livingston and his stepson switched seats so that Mr. Livingston could drive and demonstrate how to parallel park. *Id.* at 9. After Mr. Livingston demonstrated the parking strategy "a couple of times," he began putting the car into park so that his stepson could again resume driving when a man approached and stood about ten feet away. *Id.* at 9-10. Mr. Livingston positively identified the man in court as Appellant. *Id.* at 10.

Mr. Livingston testified Appellant said, "Give me my money, mother fucker." *Id.* Mr. Livingston testified he and his stepson were "in shock" and did not move. *Id.* Appellant raised a silver gun towards the direction of Mr. Livingston and his stepson, and he again said, "Give me my money, mother fucker." *Id.* at 11. Mr. Livingston and his stepson again did not move and, in response, Appellant demanded money a third time, as well as fired a shot at them. *Id.* Mr. Livingston and his stepson ducked down, and Mr. Livingston stepped on the gas driving without raising his head for about four seconds.

*Id.* As he sped out of the parking lot, he looked in his rear view mirror and saw Appellant running towards the car. *Id.* He heard "two more shots [] ring out." *Id.* at 12.

Mr. Livingston testified he drove down the street to a red light, and he observed police vehicles with activated lights and sirens pass by, so he tried to flag down a police officer. *Id.* However, the police apparently did not see him, so he followed the police vehicles for approximately three quarters of a mile at which point he arrived at the 8400 block of Lindbergh Boulevard. *Id.* When he exited his car, he saw a body lying on the sidewalk. *Id.* Mr. Livingston approached the police and informed them that he and his stepson had just been fired at while in the school parking lot. *Id.* at 13. Mr. Livingston provide the police with a description of the shooter. *Id.* at 15.

Approximately twenty minutes later, officers transported Mr. Livingston and his stepson to the Penrose Plaza shopping center where they positively identified Appellant, who the police had in custody, as the man who had shot at them in the school parking lot. *Id.* at 21-24. Mr. Livingston provided a statement to the police, and at Appellant's preliminary hearing on July 30, 2012, Mr. Livingston positively identified Appellant as the man who had shot at him and his stepson at the school. *Id.* at 27-29. Mr. Livingston testified that, prior to the day of the shooting on June 13, 2012, he had never seen Appellant and he was not acquainted with him. *Id.* at 31.

Phillip Holland, who was Mr. Livingston's stepson, testified he was at the Pepper Middle School parking lot with Mr. Livingston on June 13, 2012, in order to practice driving. N.T., 6/6/17, at 5. He substantially confirmed Mr. Livingston's testimony as to the fact that a man approached them, demanded money, pointed a gun at them, and then fired the gun at them. *Id.* at 8-9. Mr. Holland also confirmed that, on June 13, 2012, he and Mr. Livingston were transported to the Jamaican Way store, where they both positively identified Appellant as the man who had shot at them. *Id.* at 12. When asked whether he recognized Appellant in court, which was four years after the crime, Mr. Holland said, "No, I don't know. I honestly don't remember his face from that day." *Id.*

Shawna Jordan testified that, on June 13, 2012, she was working at the Jamaican Way store in the Penrose Plaza when, at approximately 5:30 p.m., Appellant walked quickly into the store. N.T., 6/2/17, at 33. As Appellant walked past the store's trash can, which was located by the front door, Ms. Jordan heard "a thump." *Id.* at 35. She clarified that it sounded as if Appellant put something in the trash can. *Id.* at 36. Ms. Jordan testified Appellant was "hyped" and asked her for chicken. *Id.* When police officers came into the store instructing him to put up his hands, Appellant complied. *Id.* She informed the police that she "heard a thump" when Appellant walked past the trash can. *Id.*

Philadelphia Police Detective Brian Peters, who was assigned to the homicide unit, testified that, on the evening of June 13, 2012, he was called to the murder scene of Mr. Brown at the 8400 block of Lindbergh Boulevard. *Id.* at 54. Witnesses at the scene informed Detective Peters there had been a chase between two people whereby one person chased another. Specifically, Detective Peters testified witnesses informed him that "[t]wo people were running, they crossed over Lindbergh [Boulevard] and they had gone in the area where the Pepper Middle School was [located], and then [on to] an apartment complex." *Id.* at 55. Detective Peters explained the chase was confirmed by various 9-1-1 calls, a cell phone found on the path, a strike mark to one of the signs inside the apartment complex, and reports from two children who observed the chase. *Id.* at 74.

Detective Peters traveled to the Jamaican Way store and arrived at 8:40 p.m. *Id.* at 59. He obtained the owner's consent to search the property, and he seized a handgun from the store's trash can. *Id.* at 64. Detective Peters testified the gun was operable, contained live cartridges, had been fired, and was cocked and primed to fire again. *Id.* at 67. Detective Peters took a statement from Ms. Jordan and he learned the store had working security cameras. *Id.* at 69-71.

Philadelphia Police Detective James Dunlap, who was assigned to the homicide unit's digital imaging video response team, confirmed he evaluated the Jamaican Way's security system and retrieved video. N.T., 6/5/17, at 4-

13. The video compilation from June 13, 2012, was shown to the jury. *Id.* at 16.

Philadelphia Police Officer Horace Lopez testified he was at the scene of Mr. Brown's murder when a white sedan pulled up and two males exited. *Id.* at 23. One of the males, later identified as Mr. Livingston, informed the detective a shooting had just occurred at the Pepper Middle School, and he provided a description of the shooter. *Id.* at 24. Detective Lopez looked at Mr. Livingston's sedan and noticed bullet holes on the driver's side door and rear quarter panel. *Id.* He informed fellow police officers via radio of the description of the suspect. *Id.* at 24-25. Detective Lopez confirmed he transported Mr. Livingston and his stepson to the Jamaica Way restaurant where they both positively identified Appellant as the man who had shot at them in the school parking lot. *Id.* at 30-33.

Philadelphia Police Officer Gary Guaraldo, who was assigned to the crime scene unit, testified that, the day after the shooting, he went to the Pepper Middle School and found three fired cartridge casings in the parking lot. *Id.* at 80. He examined the bullet holes in Mr. Livingston's sedan, and he explained to the jury that the bullets were fired into the sedan from the outside of the vehicle. *Id.* at 88-107.

Philadelphia Police Detective Francis Kane, who was assigned to the homicide unit, testified he interviewed Mr. Livingston and his stepson at the homicide unit at approximately 8:10 p.m. on June 13, 2012. *Id.* at 126-27.

During the interview, Mr. Livingston drew a diagram of the Pepper Middle School parking lot and marked the area where Appellant was standing when he shot at Mr. Livingston and his stepson. *Id.* at 129. At trial, the diagram was introduced as evidence. *Id.*

Detective Kane testified the handgun seized from the Jamaican Way store was a .9mm semi-automatic handgun, which based on ballistics was the same caliber as the weapon used by Appellant in shooting at Mr. Livingston and his stepson. *Id.* at 136. However, Detective Kane testified a .40 caliber handgun was used in the murder of Mr. Brown. *Id.* at 137. He noted a .40 caliber fired cartridge casing was found at the scene of Mr. Brown's murder. *Id.* He testified "there's no way the .9mm that [Appellant] had could have been used to shoot the .40 caliber ammunition [that was used to kill Mr. Brown]." *Id.* Accordingly, while the police ruled out Appellant as the shooter in the death of Mr. Brown, Appellant was charged with various crimes in connection with the shooting at Mr. Livingston and his stepson in the Pepper Middle School parking lot. *Id.* at 137-139. Detective Kane testified three separate guns were involved with regard to the shooting death of Mr. Brown and the shooting at the Pepper Middle School. *Id.* at 138.

The parties stipulated that if Police Officers Siranni and Jaconi were called to testify they would confirm one firearm, a .40 caliber Glock 23, was recovered from the murder scene of Mr. Brown. *Id.* at 170. Further, they would testify the only fired cartridge cases found at the murder scene were

.40 caliber casings. *Id.* at 171. The parties also stipulated that if Police Officer Andrejczak were to testify he would indicate the firearm recovered by Detective Peters from the trash can at the Jamaican Way store was a .9mm Ruger, model P85, which was operable and loaded with three Wolf full melt jacket cartridges. N.T., 6/6/17, at 24.

Philadelphia Police Officer Robert Stott, who was qualified as an expert in ballistics comparison and firearm identification, testified he examined evidence from this case, as well as the murder case of Mr. Brown. *Id.* at 27-28. He indicated the three .9mm fired cartridge casings, which the police collected from the parking lot of the Pepper Middle School, were all fired from the same gun. *Id.* at 31. Officer Stott cross-checked the three .9mm cartridge cases and concluded they were fired from the .9mm Ruger handgun, which the police found at the Jamaican Way. *Id.* He further testified a bullet specimen and bullet jacket fragments seized from Mr. Livingston's car after the Pepper Middle School shooting indicated they were fired from the .9mm Ruger handgun seized from the Jamaican Way. *Id.* at 33, 36.

However, Officer Stott testified Mr. Brown was killed with a .40 caliber handgun. *Id.* He indicated the seven .40 caliber fired cartridge casings that were found at the homicide scene were all fired from the same .40 caliber Ruger. *Id.* He testified only one firearm (a .40 caliber Ruger) was fired at Mr. Brown's homicide scene, and he opined the firearm used in Mr. Brown's

homicide was a different firearm than the one used in the shooting at the Pepper Middle School. *Id.* at 53.

The Commonwealth entered into evidence a certificate of non-licensure, which indicated that Appellant did not have a valid or lawfully issued license to carry a firearm in Pennsylvania. *Id.* at 62.

Appellant testified in his own defense. Specifically, Appellant testified that, on June 13, 2012, at around 5:00 p.m., he drove to the 8400 block of Lindbergh Boulevard with a friend, Vernon McDonald. *Id.* at 75. Appellant admitted he and Mr. McDonald were both carrying firearms and they were in the area so that Mr. McDonald could purchase drugs. *Id.* at 76. Appellant indicated he lent Mr. McDonald money for the purchase. *Id.*

Appellant testified he exited the car to make a phone call while Jamal Gregory and Mr. Brown entered the car to talk with Mr. McDonald. *Id.* at 76-77. Appellant indicated that, at some point, all of the other men exited the car and "everybody started pulling guns out, shots fired, robbed me, chaos, there [were] kids, people outside, and everybody running. And at the same time right after that happened, I see one of the guys and I go chasing after him." *Id.* at 77-78. Appellant testified he began chasing Mr. Gregory through the apartment complex and towards the Pepper Middle School. *Id.* at 80.

Appellant indicated he thought Mr. Gregory entered the vehicle in the Pepper Middle School parking lot, so he began yelling that he wanted his money back. *Id.* He denied that he ran with or had his gun in his hand;

however, he admitted that, when the driver of the vehicle bent down, he thought the driver was going to sit back up with a gun, so Appellant began firing his gun. *Id.* at 80-81. Appellant admitted he then ran to the Penrose Plaza shopping center. *Id.* at 81.

On cross-examination, when presented with 9-1-1 calls, Appellant admitted various callers reported they saw Appellant holding a handgun as he chased Mr. Gregory. *Id.* at 99.

At the conclusion of all evidence, the jury convicted Appellant of the crimes indicated *supra* in connection with the shooting at the Pepper Middle School, and immediately following the jury's verdict, Appellant agreed to a non-jury trial on the charge of possession of a firearm prohibited. The trial court convicted Appellant of the charge, and on August 18, 2017, Appellant was sentenced to an aggregate of forty-five years to ninety years in prison. Appellant did not file post-sentence motions, but Appellant filed a single, timely notice of appeal.[3] All Pa.R.A.P. 1925 requirements have been met.

_____

[3] We note Appellant's notice of appeal was docketed on September 25, 2017; however, the record reveals that Appellant handed it to prison authorities on August 30, 2017. Accordingly, pursuant to the prisoner mailbox rule, we deem Appellant's notice of appeal to be timely. *See* Pa.R.A.P. 121(a).
Further, we note that Appellant filed a single notice of appeal listing both lower court docket numbers. Our Supreme Court has held that "where a single order resolves issues arising on more than one docket, separate notices of appeal must be filed for each case." *Commonwealth v. Walker*, ____ Pa. ____, 185 A.3d 969, 971 (2018). However, the Court in *Walker* declined to apply the rule to the case before it, because to do so would run "contrary to decades of case law from [the Pennsylvania Supreme Court] and the

On appeal, Appellant presents the following issues in his "Statement of the Questions Involved":

A. Was the evidence insufficient to sustain guilty verdicts for attempted murder and aggravated assault, as there was insufficient evidence proving Appellant had the criminal specific intent to kill the complaining witnesses or to cause them serious bodily injury at the time of the shooting, as Appellant reasonably believed he was in immediate danger of death or serious bodily injury?

B. Was the evidence insufficient to sustain the guilty verdict for robbery as Appellant did not have the specific intent to threaten or put the complainants in fear of serious bodily injury during the course of a theft?

C. Was the evidence insufficient to sustain the guilty verdict for [possession of an instrument of crime] as although Appellant illegally possessed the firearm, he did not possess it with the intent to employ it criminally and only discharged his firearm after reasonably believing he was in immediate danger of death or serious bodily injury?

Appellant's Brief at 7.

Initially, we note that when considering a challenge to the sufficiency of the evidence, the standard we apply is as follows:

[W]hether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-

---

intermediate appellate courts that, while disapproving of the practice of failing to file multiple appeals, seldom quashed appeals as a result." ***Id.*** Although the Court instructed that in all future cases, a failure to file a notice of appeal for each lower court docket will result in quashal of the appeal, Appellant's notice of appeal was filed prior to the ***Walker*** ruling. Accordingly, ***Walker*** is not controlling in the instant appeal, and we decline to quash Appellant's appeal.

finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Johnson*, 192 A.3d 1149, 1155 (Pa.Super. 2018) (citation omitted).

In his first claim, Appellant alleges the evidence was insufficient to sustain his convictions for either attempted murder or aggravated assault as to Mr. Livingston and Mr. Holland. Specifically, Appellant claims he was acting in self-defense when he discharged his weapon at the Pepper Middle School, and he did not have the specific intent to kill or cause serious bodily injury. He contends the evidence reveals he shot at Mr. Livingston and Mr. Holland because he reasonably thought one of them was a drug dealer who had just robbed him, and he believed one or both of them were going to shoot at him. Thus, he contends the use of force was justified since he reasonably believed he was in danger of death or serious bodily injury.

Appellant relies on the justification statute set forth in our Crimes Code that permits the "use of force upon or toward another person…when the actor believes that such force is immediately necessary for the purpose of protecting

- 14 -

himself against the use of unlawful force[.]" 18 Pa.C.S.A. § 505(a). In

*Commonwealth v. Torres*, 564 Pa. 219, 766 A.2d 342 (2001), our Supreme

Court explained:

> The use of force against a person is justified when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person. *See* 18 Pa.C.S. § 505(a). When a defendant raises the issue of self-defense, the Commonwealth bears the burden to disprove such a defense beyond a reasonable doubt. While there is no burden on a defendant to prove the claim, before the defense is properly at issue at trial, there must be some evidence, from whatever source, to justify a finding of self-defense. If there is any evidence that will support the claim, then the issue is properly before the fact finder.

*Id.* at 345 (some citations omitted).

To disprove a self-defense claim, the Commonwealth is required to prove at least one of the following: "1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; or 2) the accused provoked or continued the use of force; or 3) the accused had a duty to retreat and the retreat was possible with complete safety." *Commonwealth v. Hammond*, 953 A.2d 544, 559 (Pa.Super. 2008).

Under the Crimes Code, "[a] person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S.A. § 901(a). "A person may be convicted of attempted murder 'if he takes a substantial step toward the commission of a killing with the specific intent in mind to commit such an act.'" *Commonwealth v. Dale*, 836 A.2d 150, 153

(Pa.Super. 2003) (citations omitted). "The substantial step test broadens the scope of attempt liability by concentrating on the acts the defendant has done and does not any longer focus on the acts remaining to be done before the actual commission of the crime." *In re R.D.*, 44 A.3d 657, 678 (Pa.Super. 2012).

Here, Appellant was convicted of attempted murder in the first degree. "The *mens rea* required for first-degree murder, specific intent to kill, may be established solely from circumstantial evidence." *Commonwealth v. Schoff*, 911 A.2d 147, 160 (Pa.Super. 2006). "The law permits the fact finder to infer that one intends the natural and probable consequences of his acts." *Commonwealth v. Jackson*, 955 A.2d 441, 444 (Pa.Super. 2008). "The offense of attempt with intent to kill is completed by the discharging of a firearm at a person with intent to kill, despite the fortuitous circumstances that no injury is suffered." *Commonwealth v. Mapp*, 335 A.2d 779, 781 (Pa.Super. 1975).

Under Pennsylvania law, "a person is guilty of aggravated assault if he…attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly[,] or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S.A. § 2702(a)(1). "Serious bodily injury" is defined as "[b]odily injury which creates a substantial risk of death or which causes serious permanent disfigurement, or protracted

loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301.

"In order to sustain a conviction for aggravated assault, the Commonwealth does not have to prove that serious bodily injury was actually inflicted but rather that the Appellant acted with the specific intent to cause such injury." *Commonwealth v. Holley*, 945 A.2d 241, 247 (Pa.Super. 2008) (citation omitted). "A person acts intentionally with respect to a material aspect of an offense when…it is his conscious object to engage in conduct of that nature or to cause such a result[.]" 18 Pa.C.S.A. § 302(b)(1)(i). "As intent is a subjective frame of mind, it is of necessity difficult of direct proof." *Commonwealth v. Matthew*, 589 Pa. 487, 909 A.2d 1254, 1257 (2006) (citation omitted)). "The intent to cause serious bodily injury may be proven by direct or circumstantial evidence." *Id.*

In the case *sub judice*, we conclude the Commonwealth sufficiently established Appellant had the requisite intent for attempted murder in the first degree and aggravated assault as to Mr. Livingston and Mr. Holland. For instance, the evidence reveals that, as Mr. Livingston and Mr. Holland sat in the car in a school parking lot, Appellant demanded money, fired a shot in their direction from twelve feet away, and fired additional shots as the victims fled in their car. *See Holley*, *supra* (finding evidence sufficient to sustain convictions for attempted murder and aggravated assault where the victim testified the defendant fired a shot at her).

In concluding the Commonwealth adequately disproved Appellant's claim of self-defense, the trial court noted Appellant was not free from fault in provoking the matter, and in fact, Appellant was the aggressor in the school parking lot. Trial Court Opinion, filed 6/25/18, at 16. Also, as the trial court noted, the Commonwealth proved Appellant had a duty and opportunity to retreat from the school parking lot. *Id.* at 17. "It is by sheer luck, and the quick reflexes of [Mr.] Livingston, that neither [he nor his stepson] were hurt or killed." *Id.* We find no merit to Appellant's first claim.[4]

In his next claim, Appellant contends the evidence was insufficient to sustain his conviction for robbery as to Mr. Livingston and Mr. Holland. Specifically, Appellant contends "there was no criminal intent to commit any theft, much less a theft while using force or the threat of force." Appellant's Brief at 19. In this vein, Appellant argues the evidence reveals he was "rightfully demanding his money back" and "simply asked for his own money back" when he interacted with Mr. Livingston and Mr. Holland. *See* Appellant's Brief at 19.

_____

[4] To the extent Appellant presents a mistake of fact defense (*i.e.*, he did not have the necessary *mens rea* as to Mr. Livingston and Mr. Holland as he believed that he was shooting at Mr. Gregory), the only evidence supporting the defense was Appellant's own self-serving testimony, which the jury rejected. Accordingly, we find Appellant is not entitled to relief. *See Johnson*, *supra* (holding credibility determinations are for the fact finder).

With respect to the crime of robbery, the Crimes Code relevantly provides the following:

**§ 3701.**

**(a) Offense defined.**--

(1) A person is guilty of robbery if, in the course of committing a theft, he:

\*\*\*

(ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury[.]

18 Pa.C.S.A. § 3701(a)(1)(ii) (bold in original).

"An act shall be deemed 'in the course of committing a theft' if it occurs in an attempt to commit theft or in flight after the attempt or commission." 18 Pa.C.S.A. § 3701(a)(2). To sustain a conviction under Section 3701(a)(1)(ii), it is sufficient if the evidence demonstrates aggressive actions that threatened the victim's safety. *Commonwealth v. Hopkins*, 747 A.2d 910 (Pa.Super. 2000). The proper focus is on the nature of the threat posed by the assailant and whether he reasonably placed a victim in fear of "immediate serious bodily injury." *Commonwealth v. Rodriquez*, 673 A.2d 962 (Pa.Super. 1996). A factfinder is entitled to infer that a victim was in mortal fear when a defendant visibly brandished a firearm. *Hopkins*, *supra*.

Here, in finding the evidence was sufficient to sustain Appellant's conviction for robbery, the trial court indicated the following:

In the case at bar, both victims testified that [Appellant] approached their car and said, "Where's my money, Mother Fucker?" and then repeated [the phrase] while holding a gun in the direction of the victims, in an attempt to take their money.

[Appellant] further confirmed [in his testimony] that these statements were made and that he did shoot at the victims. Although Appellant never received any money from the victims, his demands coupled with his pointing and shooting a firearm at them was sufficient to find him guilty of robbery. The threat posed by [Appellant] holding up the gun is enough to place the victims in immediate and serious fear of bodily harm or death. The shooting of said gun is further evidence that the victims were intentionally made to fear immediate serious bodily injury and/or death. The jury found the victims' testimony to be credible. Thus, the evidence was sufficient to find [Appellant] guilty of robbery.

Trial Court Opinion, filed 6/25/18, at 19-20.

We agree with the trial court's sound analysis. Moreover, we note that, in developing his appellate argument, Appellant improperly asks that we view the evidence in the light most favorable to him, as opposed to the Commonwealth as verdict winner. *See Johnson*, *supra*. The jury was free to believe all, none, or part of Appellant's testimony, particularly as it related to the reasons he demanded money from and fired a gun at the victims. *See id.* Simply put, Appellant is not entitled to relief.

In his final claim, Appellant avers the evidence was insufficient to sustain his conviction for possession of an instrument of crime under 18 Pa.C.S.A. § 907(a). Specifically, while Appellant concedes he "illegally possessed a firearm" and, thus, is guilty of the firearm offenses, he contends "the evidence did not establish he had the intent to employ the firearm criminally." Appellant's Brief at 21. Appellant specifically argues he "only used the firearm in order to ward off what he believed to be an imminent threat to his own life." *Id.*

Under the Crimes Code, "[a] person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S.A. § 907(a). An "instrument of crime" includes "[a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa.C.S.A. § 907(d).

Here, in rejecting Appellant's claim, the trial court indicated the following:

> [Appellant] admitted that he pointed a gun and shot said gun at [Mr.] Livingston and [Mr.] Holland. He further admitted that he demanded money from the victims. Furthermore, both witnesses testified that [Appellant] approached them, demanded money at gunpoint and then shot at them. In light of this testimony, it was reasonable that the jury found that [Appellant] used an illegal firearm in the commission of a robbery. As stated above, [Appellant's] self-defense justification was presented to the jury, who then chose not to believe [Appellant]. Therefore, they did not find that he reasonably believed that he was in immediate danger of death or serious bodily harm. As a result, the jury found that he meant to employ the gun criminally.

Trial Court Opinion, filed 6/25/18, at 20-21.

We agree with the trial court's sound analysis. As with his previous claim, in developing his appellate argument, Appellant improperly asks that we view the evidence in the light most favorable to him, as opposed to the Commonwealth as verdict winner. **See Johnson**, **supra**. We conclude Appellant is not entitled to relief.

For all of the foregoing reasons, we affirm.

Affirmed.

- 21 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/7/19