J-S27012-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JOSEPH HOLMES | : | |
| | : | |
| Appellant | : | No. 920 EDA 2023 |

Appeal from the PCRA Order Entered April 6, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003019-2010

BEFORE:   LAZARUS, P.J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY LAZARUS, P.J.:                **FILED NOVEMBER 14, 2024**

Joseph Holmes appeals from the order, entered in the Court of Common Pleas of Philadelphia, dismissing, without a hearing, his petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546.  After careful review, we vacate in part, affirm in part, and remand.

On June 13, 2011, following a jury trial presided over by the Honorable Carolyn E. Temin, Holmes was convicted of first-degree murder and possession of an instrument of crime (PIC).  The trial judge summarized the facts of this case as follows:

> On February 1[4], 2008, the victim, Donovan Raheem Weary ("Weary"), called [Holmes] at his home and they arranged to meet regarding money that Weary owed [Holmes] for drugs that [Holmes] had advance[d] to Weary.  [Holmes]'s girlfriend, Niamah Fisher ("Fisher"), and his brother Joshua, were with [Holmes] when he received the call.  [Holmes] then told Joshua to go down to the basement to get a gun and after Joshua came back up, the

---

[*] Retired Senior Judge assigned to the Superior Court.

three left the Holmes brothers' home. Fisher walked north on Forrest Avenue toward Homer Street and the Holmes brothers walked south on Forrest Avenue toward Middleton Street.

After joining up with Weary, [Holmes] and Joshua walked down an alley that runs parallel to Forrest Avenue, between Forrest and Ogontz Avenues and between Middleton and Homer Streets, Fisher saw the three men walking towards Homer Street and then saw [Holmes] and Weary exchange something. She then saw [Holmes] push Weary up against a garage and shoot Weary twice in the head. [Holmes] saw Fisher on Homer Street and followed her home and told her that she should be quiet[,] or she would be next.

The crime remained unsolved until November 2009, when Fisher, believing that she was about to be replaced in [Holmes]'s affections, called the police and told them about the murder and gave the police a signed statement with details of the murder. Fisher later reconciled with [Holmes]. At trial, she repudiated her statement[,] which was then admitted into evidence.

Based on Fisher's statement the police located another witness, Raymond Johnson ("Johnson"), who gave a statement indicating that he saw [Holmes] running from the crime scene. Johnson also repudiated his statement[,] and it was also admitted into evidence.

After [Holmes] was arrested, he and Fisher exchanged letters and had several telephone conversations in which they discussed Fisher's statement and testimony. They discussed methods for her to avoid testifying or to testify in such a way that she would not admit to seeing the defendant shoot Weary.

\* \* \*

[Holmes] presented alibi evidence from [his brother,] Abraham Holmes ("Abraham"), [Abraham's girlfriend,] Tyiesha Edwards, and [Holmes' mother,] Marcella Holmes[. The alibi was that Holmes] had not left his home the day of the murder except to purchase liquor.

Trial Court Opinion, 1/27/12, at 2-3, 6.

Holmes and his brother, Joshua Holmes, were tried jointly before a jury.

Following trial, Holmes was convicted of the above-stated offenses and

- 2 -

sentenced to serve life in prison, without the possibility of parole.[1]  On August 31, 2011, Holmes filed post-sentence motions raising the following claims: weight of the evidence, prosecutorial misconduct in opening and closing arguments, jury instruction error, and improper use of prison telephone conversations.  The trial court denied the motions on September 1, 2011.

Holmes filed a timely direct appeal raising, among other issues, a newly-discovered evidence claim.  On May 3, 2012, while his appeal was pending, Holmes filed with this Court a Pa.R.Crim.P. 720(C) motion to remand the matter to the trial court.  **See** Pa.R.Crim.P. 720(C) ("A post-sentence motion for a new trial on the ground of after-discovered evidence must be filed in writing promptly after such discovery.").  Our Court denied the motion without prejudice to allow Holmes to re-raise the issue in his appellate brief.

Following our directive, Holmes raised, in his appellate brief, the claim that "two eyewitness[, Malik Mack and Demon McNeail,] have been discovered [and] . . . from new information provided, it appears that the shooter is not [Holmes,] but was Terrell Woods, whose nickname is 'Street.'"  **See Commonwealth v. Holmes**, 2665 EDA 2011, *4 (Pa. Super. filed Feb. 6, 2013) (unpublished memorandum decision).  Attached to his motion, Holmes included a letter from McNeail, with an accompanying envelope postmarked April 23, 2012.  **Id.**  Holmes also identified in his brief another individual, Darryl Witherspoon, and attached a copy of a handwritten letter from Witherspoon, allegedly received by counsel on May 25, 2012.  Determining

---

[1] Joshua was convicted of third-degree murder.

that Witherspoon's letter[2] "present[ed] a colorable claim of after-discovered evidence," *id.* at *7, our Court vacated Holmes' judgment of sentence and remanded the case for an evidentiary hearing to determine whether Holmes was entitled to relief on his after-discovered evidence claim. *Id.* at *7, *10.

On remand, the trial court held two days of evidentiary hearings and one day of oral argument and, on July 19, 2013, issued findings of fact and conclusions of law that dismissed Holmes' after-discovered evidence claims as meritless and denied his motion for a new trial. *See* Order, 7/19/13. In that same order, the court also reinstated Holmes' first-degree murder sentence of life without the possibility of parole. *Id.* On July 25, 2013, Holmes filed a notice of appeal from his reinstated sentence, claiming that the trial court erred by not granting him a new trial based on his after-discovered evidence claim. On June 16, 2014, our Court affirmed Holmes' judgment of sentence, concluding that the trial court did not abuse its discretion denying his motion for a new trial. *See id.*, 2082 EDA 2013 (Pa. Super. filed Aug. 1, 2014)

_____

[2] Witherspoon's letter stated, in relevant part:

> Streets who [sic] real name is Terrell Woods was a real close friend of mine confided in me and told me that he had set him up by having Double met him in the driveway so he could buy some drugs off Double. He said when he met Double in the driveway he shot him in the head twice. He told me he him [sic] stop hustling on that side of the tracks.

*Id.* at *6. Witherspoon also states in his letter, "I may have some vital information to a homicide that happened in the alley on Forrest Avenue behind the Gulf gas station." *Id.*

(unpublished memorandum decision). Holmes filed a petition for allowance of appeal, which the Pennsylvania Supreme Court denied on October 8, 2014.

On March 24, 2015, Holmes filed his first PCRA petition *pro se*. On December 11, 2015, Holmes filed a *pro se* supplemental PCRA petition. On October 27, 2017, the court appointed PCRA counsel, David Rudenstein, Esquire. Counsel filed an amended PCRA petition on March 26, 2018, claiming that Holmes was entitled to a new trial due to trial counsel's ineffectiveness for failing to object to the prosecution's misconduct during closing argument.[3] *See* Amended PCRA Petition, 3/26/18, at ¶ 14(a). On September 25, 2018, PCRA counsel filed a supplemental amended PCRA petition, incorporating his prior amended petition and adding the following supplemental claim—that trial counsel was ineffective for failing to challenge the Commonwealth's withholding of exculpatory material.[4] The Commonwealth filed an answer to the PCRA petition and, on June 14, 2019, the trial court, on the record, gave its reasons for concluding Holmes' issues had no arguable merit and stated

_____

[3] Several continuances occurred between September 2017 through January 26, 2018. Moreover, despite being represented by counsel, on March 16, 2018, Holmes filed a second *pro se* supplemental PCRA petition.

[4] Specifically, the claim alleged that Philadelphia Police Officer Kyle Cross testified that, on the evening of the murder in question, he had completed a police department "Pedestrian Investigation and/or Vehicle Form, indicating the police had stopped and questioned two males, Holmes and Brandon Jackson, just a few doors down from where the murder took place. The petition alleges that the Commonwealth did not disclose to the defense the fact that Jackson had been stopped and questioned or that the officer filled out the form prior to trial.

- 5 -

that it would be issuing Pa.R.Crim.P. 907 notice of its intent to dismiss Holmes' petition without a hearing.[5]  **See** N.T. Rule 907 Notice, 6/14/19, at 5-8.

On July 29, 2019, the court held a remote **Grazier**[6] hearing,[7] and, on August 5, 2019, granted Attorney Rudenstein permission to withdraw and permitted Holmes to proceed *pro se*.[8]  The court ordered Holmes to file an amended PCRA petition and an answer to the court's Rule 907 notice.  Holmes complied and filed an amended petition and Rule 907 response on September 19, 2019.  Holmes' petition also included a signed affidavit, dated September 4, 2019, from Raymond Johnson, wherein Johnson averred that more than one year after the murder, homicide detectives picked him up and took him to the homicide division where they interviewed him and coerced him into "saying what they wanted him to say" even though Johnson "repeatedly told [the Lieutenant] that [he] did not see or hear the shooting."  Affidavit of Raymond Johnson, 9/4/19, at 2.  **See also id.** at 1 ("The detectives told me again that they were going to lock me up if I did not tell them what they

_____

[5] Holmes continued to file several *pro se* motions, although he was represented by PCRA counsel, while his petition was pending.

[6] **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998) (when defendant seeks waiver of right to counsel at post-conviction and appellate stages, trial court must conduct on-the-record determination that waiver is knowing, intelligent, and voluntary).

[7] Holmes filed a *pro se* "Motion for a **Grazier** Hearing" stating that he "is displeased with his counsel [] and wishes to proceed *pro se* during his PCRA proceeding."  Motion, 6/12/18, at 1.

[8] James Lloyd, Esquire, was subsequently appointed as "back-up" counsel.

wanted to hear."); *id.* (detective told Johnson "that he was going to keep [him] for 72 hours"); *id.* at 2 ("The Lieutenant told me what he wanted me to say.").

On July 20, 2020, Teri B. Himebaugh, Esquire, entered her appearance on behalf of Holmes, and filed a supplemental PCRA petition. On October 26, 2022, the trial judge stated on the record that he had "reviewed the comprehensive and amended PCRA petitions by both counsel," that he was "confident in [his] decision-making process[,]" and that he was "dismissing these matters without an evidentiary hearing." N.T. PCRA Proceeding, 10/26/22, at 3-4. On January 30, 2023, the trial court issued Rule 907 notice of its intent to dismiss Holmes' petition without a hearing. Holmes did not file a response to the Rule 907 notice. On April 6, 2023, the trial court dismissed Holmes' petition. Holmes filed a timely notice of appeal and Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

On appeal, Holmes presents the following issues for our consideration:

(1)     Did the PCRA [c]ourt err in finding that the after[-]discovered evidence that Dets. Pitts, Glenn, and Jenkins habitually used an unconstitutional interrogation pattern and practice [that] was not disclosed by the Commonwealth[,] was untimely[,] and/or lacked merit[?] Alternatively, did the PCRA court err in finding that counsel was not ineffective for failing to identify and present this evidence?

(2)     Did the PCRA [c]ourt err in finding that the after[-]discovered evidence[,] which was consistent with trial testimony from Johnson and Fisher relating to the undisclosed unconstitutional interrogation pattern and practice[,] was untimely and/or lacked merit?

(3)    Did the PCRA [c]ourt err in finding that counsel was not ineffective for failing to object to improper prosecutorial comments?

(4)    Did the PCRA [c]ourt err in finding that counsel was not ineffective for failing to move to suppress and preclude the introduction of handwritten letters as not properly authenticated?

(5)    Did the PCRA [c]ourt err in finding that counsel was not ineffective for failing to adequately prepare and review the prison phone calls which result[ed] in his failure to cross-examine Fisher with exculpatory conversations and for failing to move to preclude the introduction of transcripts prepared by the prosecutor?

(6)    Did the PCRA [c]ourt err in finding that counsel was not ineffective for failing to make a ***Brady***[9] challenge related to two possible witnesses identified in the pedestrian investigation form?

(7)    Did the PCRA [c]ourt err in finding that counsel was not ineffective for failing to object [to] the Commonwealth's withholding [of] documents relating to [Holmes'] arrest in 2005?

(8)    Did the PCRA [court] err in finding that there was no violation based on the cumulative impact of trial counsel's ineffective acts and omissions?

Appellant's Brief, at 11-12.

We review an order dismissing a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level. ***Commonwealth v. Burkett***, [] 5 A.3d 1260, 1267 (Pa. Super. 2010). This review is limited to the findings of the PCRA court and the evidence of record. ***Id.*** We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error. ***Id.*** This Court may affirm a PCRA court's decision on any grounds if the record supports it. ***Id.*** We grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. ***Commonwealth v. Carter***, [] 21 A.3d 680, 682 (Pa. Super. 2011). However, we afford no such deference to its legal

---

[9] ***Brady v. Maryland***, 373 U.S. 83 (1963).

conclusions. ***Commonwealth v. Paddy***, [] 15 A.3d 431, 442 (Pa. 2011); ***Commonwealth v. Reaves***, [] 923 A.2d 1119, 1124 (Pa. 2007). [W]here the petitioner raises questions of law, our standard of review is *de novo* and our scope of review is plenary. ***Commonwealth v. Colavita***, []993 A.2d 874, 886 (Pa. 2010).

***Commonwealth v. Ford***, 44 A.3d 1190, 1194 (Pa. Super. 2012) (some citations omitted).

Moreover, where ineffective assistance of counsel is pled, counsel is presumed effective, and the petitioner bears the burden of proving ineffectiveness. ***Commonwealth v. Cooper***, 941 A.2d 655, 664 (Pa. 2007). In order to obtain relief, a petitioner must prove that counsel's representation was deficient, and that the petitioner was prejudiced thereby. ***Strickland v. Washington***, 466 U.S. 668 (1984). Specifically, a petitioner must plead and prove, by a preponderance of the evidence, that:

> the underlying claim has arguable merit; counsel's actions lacked any reasonable basis[;] and counsel's actions prejudiced the petitioner. Counsel's actions will not be found to have lacked a reasonable basis unless the petitioner establishes that an alternative not chosen by counsel offered a potential for success substantially greater than the course actually pursued. Prejudice means that, absent counsel's conduct, there is a reasonable probability the outcome of the proceedings would have been different.

***Commonwealth v. Brown***, 48 A.3d 1275, 1277 (Pa. Super. 2012) (citation omitted).

Finally, in a PCRA proceeding, a judge shall order a hearing:

> (1) whenever the Commonwealth files a motion to dismiss due to the defendant's delay in filing the petition; or

> (2) when the petition for post-conviction relief or the Commonwealth's answer, if any, raises material issues of fact. However, the judge may deny a hearing on a specific issue of fact

when a full and fair evidentiary hearing upon that issue was held at trial or at any proceeding before or after trial.

The judge shall schedule the hearing for a time that will afford the parties a reasonable opportunity for investigation and preparation, and shall enter such interim orders as may be necessary in the interests of justice.

Pa.R.Crim.P. 908(A).

Holmes first contends that he is entitled to a new trial based upon after-discovered evidence that reveals "an unconstitutional pattern and practice utilize[d] by Det[ective] Pitts and multiple other Homicide detectives during interrogations, consistent with abuse testified to by [] Johnson and [] Fisher" who were both key eyewitnesses for the Commonwealth. Appellant's Brief, at 17, 22. Holmes, citing 42 Pa.C.S.A. §§ 9545(b)(1)(i) and (ii),[10] alleges that this after-discovered evidence was not discovered sooner by the defense due to "governmental interference," *id.* at § (b)(1)(i), and that trial counsel was ineffective for failing to investigate and present this evidence. Appellant's Brief, at 17.

In order to prevail on an after-discovered evidence claim presented in a timely PCRA petition, a petitioner must prove that: "(1) the [exculpatory] evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not

---

[10] We note that section 9545(b)(1) is a subsection delineating the exceptions that a petitioner must prove to establish a court's jurisdiction over an untimely filed PCRA petition. *See* 42 Pa.C.S. § 9545(b)(1) ("[a]ny petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves [one of the timeliness exceptions under this subchapter]"). Here, it is undisputed that Holmes petition was timely filed.

- 10 -

cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict." ***Commonwealth v. D'Amato***, 856 A.2d 806, 823 (Pa. 2004); ***see also*** 42 Pa.C.S.A. § 9543(a)(2)(vi) (to be eligible for PCRA relief on after-discovered evidence claim, petitioner must prove "[t]hat the conviction or sentence resulted from . . . [t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced").

Where the after-discovered evidence takes the form of an officer's undisclosed misconduct, a PCRA petitioner bears the burden of establishing a direct "nexus" between the undisclosed misconduct and the petitioner's case. ***See Commonwealth v. Foreman***, 55 A.3d 532, 537-38 (Pa. Super. 2012). It is well-settled that evidence of police misconduct in an unrelated case does not qualify as after-discovered evidence, as it would only be used for impeachment purposes. ***See Commonwealth v. Brown***, 134 A.3d 1097, 1109 (Pa. Super. 2016) (affirming denial of new trial when witnesses' testimony about Detective Pitts' misconduct in other cases "would solely be used to impeach Detective Pitts' credibility"). On the other hand, evidence does not merely impeach credibility when it establishes an alternative theory of the commission of the crime or contradicts the only link of the defendant to the offense. ***See Commonwealth v. Crumbley***, 270 A.3d 1171, 1179 (Pa. Super. 2022); ***Commonwealth v. McCracken***, 659 A.2d 541, 545-46 (Pa. 1995).

In her statement to Detectives Pitts and Jenkins, Fisher said the victim used to sell drugs with Holmes on the 7200 block of Forrest Avenue and that Fisher had been in a relationship with Holmes but broke up with him after he impregnated another woman in December 2007. Fisher's statement also indicated that she was present when Holmes shot and killed the victim, specifically stating that after Holmes and the victim appeared to exchange something by hand, she saw Holmes push the victim up against a garage, after which Holmes lifted his right arm, and shot the victim.[11] Following the shooting, Fisher stated that Holmes had Joshua hold Fisher's arms while he grabbed her neck and asked her if she had seen anything. When Fisher told Holmes that she had not seen anything, he responded, "You better keep it that way or you'll be next." Fisher said Holmes threatened her and told her not to speak about the shooting or he would kill her or her family, which is why she did not come forward earlier to provide a statement.

However, at trial, Fisher recanted her statement, testifying that she told detectives that she had an anonymous tip on a murder, but when she went to the station to give her statement, the detectives locked her in a room for six hours, took her cell phone, and identification, and removed the string from her hoodie. *See* N.T. Jury Trial, 6/7/11, at 196-97. Fisher further testified that the detectives threatened her, *id.* at 199 (detective told her he would

_____

[11] Fisher stated that she never actually saw a gun, but that she saw Holmes "lift[] his right arm like this[,]" heard a gunshot, and then saw the victim "slid[e] down the garage to the ground." Niamah Fisher Statement, 11/11/09, at 3-4.

- 12 -

handcuff Fisher to chair if she knocked on door again), told her that they could take her daughter from her if she didn't incriminate Holmes in the murder, *id.*, 6/8/11, at 33-36, that they were very rude to her, *id.*, 6/7/11, at 203, and that they said, "if you're not going to cooperate with us, why should we give you anything [to drink]." *Id.* at 204. When Fisher told the detectives that she had heard a "rumor that her [boyfriend, Holmes,] had something to do with [Weary's] murder," *id.* at 203, the detectives told her she was a "liar" and that she knew more about Holmes' involvement in the murder than she was telling them. *Id.* at 204. Fisher stated that the detectives started "typing stuff that [she] didn't say [because it] sound[ed] better like [that]." *Id.* at 206. *See id.* at 207-08 (Fisher testifying she never said the things detective typed on statement, including her being threatened by Holmes, knowing particulars about Holmes' drug sales and operations, and wanting to be in Witness Protection Program). Finally, Fisher testified that on the morning of the day she spoke to the detectives, she had taken 12 Xanaxes that made her feel "delusional" and that she couldn't really recall anything else the detectives had made up in her statement. *Id.* at 209-12.

Johnson testified that in November 2009, Homicide Detectives Glenn and Cummings approached him while he was working on a car in an alley on Ogontz Avenue. *See* N.T. Jury Trial, 6/7/11, at 132-33. The detectives told Johnson that they wanted to ask him some questions at the police station and proceeded to take him to the station, where they removed Johnson's shoestrings and took his phone, belt, and shirt from him. *Id.* at 134-35. The

detectives asked Johnson questions about Weary's murder. *Id.* at 135. Johnson, who stated that he cannot read or write, testified similarly to Fisher that that the detectives locked him in a room, "told [him what] to say" in the statement, and that "[t]hey was [sic] trying to tell [him he] knew that Josh and Joe shot somebody." *Id.* at 136. *See id.* ("They kept telling me I saw them—I saw who did it. I kept telling them ["]no.["]). *See also id.* at 137 (Johnson testifying detective with "knots" on his head "took [him] in the room[, t]ook my belt and phone and all that, and he told me if I didn't say what he wanted to hear, I was going to get locked up."); *id.* at 138-39 (Johnson testifying detectives wouldn't give him his stuff back until he signed statement).

In his brief, Holmes states that the detectives "h[eld] Fisher for over seven hours" and that at trial "Fisher . . . testified that she told defense counsel that the [d]etectives were scaring her, leading her to say, 'what they wanted me to say, and that the statement (to [d]etectives) was false.'" Appellant's Brief, at 22, citing N.T. Jury Trial, 6/8/11, at 16. Moreover, at trial, Fisher recanted her statement made to the detectives, testifying that they "made her say [that Holmes shot the victim]" and that they threatened to take her daughter away from her to scare her into making statement that Holmes shot the victim. *Id.* at 33.

> Concerning recantation testimony, our Supreme Court has stated:
>
> We acknowledge that, as a general matter, recantation evidence "is notoriously unreliable, particularly where the witness claims to have committed perjury." *Commonwealth v. Dennis*, [] 715 A.2d 404, 416 (Pa. 1998); accord [] *McCracken*, [] 659 A.2d [at]

545 []; **Commonwealth v. Mosteller**, [] 284 A.2d 786, 788 ([Pa.] 1971).  This Court has also emphasized, however, that, even as to recantations that might otherwise appear dubious, **the PCRA court must, in the first instance, assess the credibility and significance of the recantation in light of the evidence as a whole.**

**Commonwealth v. D'Amato**, 856 A.2d 806, 825 (Pa. 2004) (emphasis added).

Here, the trial court dismissed Holmes' petition without a hearing.  In **D'Amato**, **supra**, the Supreme Court noted that a PCRA court "must assess the credibility of the recantation and its significance in light of the evidence as a whole before it can deny PCRA relief on the ground that the claim lacks merit."  **Id.** at 825.  Where a PCRA court "simply rejects a recantation claim without any evidentiary hearing and without making such an assessment, the dismissal must be vacated and the case remanded for the PCRA court to make a determination of credibility and significance of the recantation testimony." **Commonwealth v. DeFranco**, 283 A.3d 345, *8 (Pa. Super. 2022) (Table),[12] citing **D'Amato**, 854 A.2d at 825-26; **Commonwealth v. Williams**, 732 1167, 1180-81 (Pa. 1999).

Here, Holmes argues that the PCRA court erred by failing to grant him an evidentiary hearing on his PCRA petition with regard to an after-discovered evidence claim based on proven police misconduct, which was committed by officers herein, albeit in other cases.  In those cases, the police misconduct occurred long after Holmes' trial and the defendants' convictions were vacated

_____

[12] **See** Pa.R.A.P. 126(b) (non-precedential decisions filed after May 1, 2019, may be cited for persuasive value).

- 15 -

due to the officers' "pattern and practice" of serious misconduct—misconduct that is substantially similar to what is alleged by the recanting witnesses in this matter. This is relevant since a judge hearing this evidence could determine that the presumption against recantation testimony has been successfully rebutted and, potentially, grant PCRA relief. Unlike a myriad of cases that deem this police misconduct evidence as purely being used to impeach the credibility of the officers' testimony, here, there is another potentially non-impeachment purpose to allow it to be heard by a jury. Specifically, where critical Commonwealth witnesses alleged police misconduct at Holmes' trial and then recanted their statements made to officers due to that alleged coercion, the post-trial misconduct evidence can bolster the credibility of those recantations. *Cf. Commonwealth v. Soto*, Nos. 831-834 EDA 2023 (Pa. Super. filed May 14, 2024) (unpublished memorandum decision); *Commonwealth v. Mumin*, 251 A.3d 1263 (Pa. Super. filed March 26, 2021) (unpublished memorandum decision).[13]

The PCRA judge, the Honorable Scott DiClaudio, gave the following reason why Holmes' claim after-discovered evidence did not have merit:

> Petitioner submitted a signed paper from Brandon Jackson that he would testify that he [was] at the scene minutes after the shooting and that the petitioner was not agitated or nervous and did not have a firearm.
>
> The statement of Brandon Jackson cannot be after[-]discovered evidence[,] as Jackson was with the petitioner shortly after the

---

[13] *See* Pa.R.A.P. 126(b) (unpublished memorandum decisions of Superior Court filed after May 1, 2019, may be cited for persuasive value).

shooting and[,] accordingly[,] petitioner would have been aware of Jackson as a potential alibi witness.

Petitioner cannot now claim he was not aware of Jackson's possible testimony, no[r] can he prove that it was not previously discovered by due diligence. Thus, his claim can have no merit. How could it possibly be after[-]discovered if he w[as] the person who knew of it[?]

Petitioners also allege newly[-]discovered facts that Detective Pitts had a pattern and practice of coercing witnesses[,] specifically relating to the testimony of Naimah Fisher and Raymond Johnson.

However, both of those witnesses recanted their statements to the police during the trial and before the jury. The petitioner references newspaper articles about Detective Pitts and mention[s] cases that Pitts was involved in where petitioners were exonerated. Yet, these cases are not relevant to my case, the case that I'm deciding today.

Second, **while Detective Pitts was involved in the case at bar, he did not take the statement of Ms. Fisher.** The Commonwealth read into evidence threatening letters from Joseph Holmes to Ms. Fisher as well as played recorded phone calls from Joseph's phone to Ms. Fisher attempting to dissuade her from testifying.

The petition does not submit any statement from Ms. Fisher stating that she was coerced or forced to testify for Detective Pitts, and for these reasons this claim has no merit.

N.T. PCRA Proceeding, 10/26/22, at 9-10 (emphasis added). Then, in his Rule 907 notice indicating his reasons for dismissing Holmes' petition without a hearing, the PCRA judge stated:

Petitioner also alleges as [a] newly[-]discovered fact that Det[ective] James Pitts had a pattern and practice of coercing witnesses, specifically relating to the testimony at trial of Naimah Fisher and Raymond Johnson, both of whom recanted their statements to police. While [**D]etective Pitts did take the statement of Ms. Fisher**, it is more likely she was more afraid of petitioner. The Commonwealth read into evidence threatening letters sent to Ms. Fisher as well as recorded phone calls. Petitioner also does not submit any statement from Ms. Fisher

- 17 -

> stating she was coerced or forced to testify by Detective Pitts. Thus, all claims by petitioner are deemed by this [c]ourt to have no merit.

N.T. Rule 907 Notice, 1/20/23, at ¶ 4.

As noted above, a PCRA judge must, in the first instance, assess the credibility and significance of the recantation in light of the evidence as a whole. **D'Amato**, **supra**. Here, however, the PCRA judge—who was not the judge that presided over Holmes' trial—arrived at his factual findings without an evidentiary hearing and testimony, based solely upon a cold review of the record. The PCRA judge has never had the opportunity to observe Fisher or Johnson testify. Moreover, trial was conducted more than 13 years ago before the PCRA court's review of the instant petition asserting this after-discovered evidence claim—one of a pattern and practice of police misconduct that had since become known to the public. Notably, the PCRA judge contradicted himself when he first said that Detective Pitts did **not** take Fisher's statement and then later said that he **did**; this inconsistency bears directly on establishing a "nexus" between the undisclosed police officer misconduct and Holmes' case. **Foreman**, **supra**.

Because the trial judge did not assess Holmes' claim of this pattern and practice of police misconduct, by using his own independent judgment to determine whether Fisher and Johnson have successfully rebutted the presumption that their recantation evidence "is notoriously unreliable, **D'Amato**, **supra**, we are constrained to remand for an evidentiary hearing to consider this material issue of fact. **See** Pa.R.Crim.P. 908(A). Notably, this additional evidence, which surfaced well after Holmes' trial, is *not* the same

as that which was put before the jury.[14]  *See* Trial Court Opinion, 9/7/23, at 9 (Judge DiClaudio relying on prior PCRA judge's statement that "allegation that the detectives fabricated the statements of Fisher and Johnson were before the jury [and] it was the province of the jury as the fact finders to believe the contents of a statement or the witness's live testimony").[15]

In his next claim, Holmes contends that the PCRA court erred when it determined counsel was not ineffective for failing to object to improper prosecutorial comments made during closing arguments.  Holmes relatedly argues that defense counsel was ineffective for failing to object to these remarks where they prejudiced the jury against him.

> With specific reference to a claim of prosecutorial misconduct in a closing statement, it is well settled that "[i]n reviewing

_____

[14] We are careful to distinguish this case from ***Commonwealth v. Castro***, 93 A.3d 818 (Pa. 2014), wherein our Supreme Court concluded that the defendant was not entitled to a PCRA hearing on his motion for a new trial based on after-discovered evidence.  In that case, the evidence consisted of a newspaper article discussing a police officer's alleged misconduct.  The Court specifically found that the evidence in the article constituted "double hearsay" because it was based on a reporter's version of the story and there was no identification of actual physical or documentary evidence to support those allegations of misconduct.  ***Id.***  By contrast, in the instant case the officers have been formally sanctioned, and, in some cases, convicted for their misconduct—not inadmissible hearsay.  ***See Steinhouse v. Workers' Compensation Appeal Board (A.P. Green Services)***, 783 A.2d 352, 356-57 (Pa. Cmwlth. 2001) (holding newspaper article regarding indictment of health care provider inadmissible hearsay, as it was not corroborated by witness testimony; furthermore, indictment was inadmissible to impeach provider's credibility, as it was prior bad act not resulting in conviction; arrest or indictment do not establish guilt, and are hearsay assertions of guilt).

[15] The Honorable Sandy Byrd similarly stated his reasons, in open court, why Holmes' petition should be dismissed without an evidentiary hearing and Rule 907 notice should issue.  *See supra* at 5-6.

prosecutorial remarks to determine their prejudicial quality, comments cannot be viewed in isolation but, rather, must be considered in the context in which they were made." Our review of prosecutorial remarks and an allegation of prosecutorial misconduct requires the appellate court to evaluate whether a defendant received a fair trial, not a perfect trial.

*Commonwealth v. Judy*, 978 A.2d 1015, 1019 (Pa. Super. 2009) (internal citations and quotation marks omitted). Moreover,

[A] prosecutor has considerable latitude during closing arguments and his arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence. Further, prosecutorial misconduct does not take place unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict. Prosecutorial misconduct is evaluated under a harmless error standard. While a prosecutor cannot [] offer his views as to a defense strategy, he can fairly respond to attacks on a witness's credibility.

*Commonwealth v. Holley*, 945 A.2d 241, 250 (Pa. Super. 2008) (internal citations and quotation marks omitted).

Specifically, Holmes asserts that the trial court permitted the prosecutor to make improper remarks that were either inflammatory or not based on evidence, including: (1) her opinion regarding how the victim's lifeless body was positioned against the garage door; (2) her comment that Holmes and his brother "looked fishy;" (3) her statement that, when witnesses recant their testimony, we don't say "Oh, all right. You know what? This murder is on us. We'll let you get away with this one;" (4) her comment that there was an inference that someone probably took one of the victim's two cell phones (one for family calls and the other for drug deals); (5) mocking Fisher when she was discussing the letters Holmes wrote to her; (6) inviting the jury to

speculate that Holmes would hurt Fisher if he were acquitted; (7) impermissibly vouching for the credibility of the investigating detectives in the case, including Detective Pitts; and (8) yelling, "in a physically aggressive manner [that] Joseph Holmes, on February 14th, 2008, Joseph Holmes took a gun in his hand and said, You know what? Today, I decide who lives and who dies. That's my job today.'"[16] **See** Appellant's Brief, at 47-54.

On direct appeal, Holmes raised several claims of prosecutorial misconduct related to the prosecutor's behavior during opening and closing statements. **See Holmes**, 2665 EDA 2011 (Pa. Super. filed Feb. 6, 2013) (unpublished memorandum decision). Our Court ruled on the merits and concluded that Holmes was entitled to no relief on those claims. **Id.** at *9. The claims included the prosecutor insinuating that Holmes would hurt Fisher if he were acquitted and the prosecutor "walk[ing] across the [court]room to the defense table and lean[ing] over and scream[ing] at the top of her lungs" at Holmes. Because Holmes' underlying legal issue of prosecutorial misconduct lacks arguable merit, his ineffectiveness claim based on counsel's failure to object is unavailing. **See Commonwealth v. King**, 57 A.3d 607, 622 (Pa. 2012) (where no factual basis to sustain underlying claim, any allegation of ineffective assistance based on counsel's behavior must fail).

---

[16] In this instance, the trial court sustained the defense's objection to the prosecutor's behavior during her closing, told her it was unprofessional, and instructed the prosecutor to refrain from doing it again. **See** N.T. Jury Trial, 6/10/11, at 204.

With regard to the remaining claims of prosecutorial misconduct Holmes raises for the first time in his PCRA petition, we conclude that they do not amount to reversible error and, thus, are meritless. In particular, several of the prosecutor's comments were made in fair response to evidence presented by the defense at trial and other comments were mere oratorical "flair" that did not form a fixed bias or hostility in the minds of the jury toward Holmes. *Holley*, *supra*.

In his next issue, Holmes argues that counsel was ineffective for failing to move to suppress and preclude the introduction of Holmes' handwritten letters sent to Fisher where the letters were not properly authenticated and, thus, were inadmissible hearsay. *See* Pa.R.E. 901(a).

Rule 901(a) requires that a proponent of evidence "produce evidence sufficient to establish that the item is what the proponent claims it is," unless the parties stipulate to its authenticity. *Id.* Here, Holmes' trial counsel objected and filed a motion *in limine* to exclude the letters as a violation of Holmes' privacy; that motion was ultimately denied. *See* N.T. Jury Trial, 6/8/11, at 7. Additionally, the Commonwealth properly authenticated several letters by having Fisher identify them multiple times at trial. *See id.*, 6/7/11, at 273-76; *id.* at 6/8/11, at 12. Despite these efforts, Holmes claims that there were "other unauthenticated" letters that were introduced at trial that "left the jury with the inference that all the other letters were in the same threatening vein casting [Holmes] in an unfavorable light to the jury." Appellant's Brief, at 60.

The record reveals that the Commonwealth only entered three authenticated letters into evidence as exhibits. *See* N.T. Jury Trial, 6/7/11, at 275 (Q: "How many letters are you marking? A: "Just the three that we had discussed, Your Honor."). Fisher specifically identified those letters during her testimony. *See id.*, 6/8/11, at 5-6, 8-12. Moreover, Fisher's only comment regarding the other letters was that "[s]ome of the letters [she gave the detectives she] didn't even read [her]self." *Id.*, 6/7/11, at 274. This brief mention of letters cannot result in prejudice to Holmes where their content was never revealed. Thus, we cannot conclude that this claim has merit.

Next, Holmes contends that the PCRA court erred in finding that counsel was not ineffective for failing to adequately prepare and review the prison phone calls between Holmes and Fisher which, then, resulted in counsel's failure to cross-examine Fisher with exculpatory conversations and failure to move to preclude the introduction of allegedly inaccurate transcripts prepared by the prosecutor. This claim is meritless.

As with the letter discussed above, defense counsel filed a motion to preclude admission of the calls. In response to the motion, the court permitted the prosecutor to bring in only "relevant" phone calls. Holmes' counsel used the limited content of those calls to extensively cross-examine Fisher regarding her lying to incriminate Holmes out of anger. Because this strategy bolstered Holmes' defense, we find this claim meritless. *See Brown*, *supra*.

- 23 -

With regard to the admission of inaccurate transcripts, the record reveals that counsel did object to their inaccuracy, *see* N.T. Jury Trial, 7/8/11, at 79, and, as result, the trial court gave a cautionary instruction to the jury. *Id.* at 80-82. Accordingly, we do not find counsel was ineffective where the jury presumably followed the court's instruction. *See Commonwealth v. Means*, 773 A.2d 143, 157 (Pa. 2001) (jury presumed to follow trial court's instructions).

Next, Holmes claims that the PCRA court erred by not finding counsel ineffective for failing to make a *Brady* challenge relating to two possible witnesses identified in a pedestrian investigation form completed by Officer Kyle Cross. Holmes contends that the law mandates that the Commonwealth should have "promptly turned over" this information to the defense, where the evidence supported his defense of mistaken identity. Appellant's Brief, at 71, Holmes asserts that the evidence was exculpatory because it "pointed to another individual as potentially either the shooter or someone who had valuable information about the shooting." *Id.*

A *Brady* violation is established where the defendant demonstrates "(1) the evidence was suppressed by the Commonwealth, either willfully or inadvertently; (2) the evidence was favorable to the defendant; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant." *Commonwealth v. Antidormi*, 84 A.3d 736, 747 (Pa. Super. 2014). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial[,]

does not establish materiality in the constitutional sense." ***Id.*** (citation and quotation marks omitted).

Officer Cross testified that he came into contact with "[t]wo people . . . on February 14th of '08, at approximately 6 o'clock p.m., No. 1 was Brandon Jackson. The second male [] that I came into contact with was Joshua Holmes." N.T. Jury Trial, 6/9/11 at 40. Officer Cross testified that neither of the two men had any information about the shooting. ***Id.*** at 41.

Holmes contends that "[h]ad the Commonwealth timely provided the pedestrian form to the defense, the defense could have investigated and presented evidence of other individuals who were present at the scene of the murder shortly after it happened." Appellant's Brief, at 72. However, Officer Cross testified that there was no one else "milling around" the area on Forrest Street surrounding the crime scene at the time he was conducting his investigation. N.T. Jury Trial, 6/9/11, at 44. Because the mere possibility that this information may have helped the defense is not sufficient to prove its materiality as it relates to a ***Brady*** claim, ***Antidormi***, ***supra***, we conclude that this claim fails.

Holmes next asserts that the PCRA court erred in finding that counsel was not ineffective for failing to object to the Commonwealth's withholding of documents relating to Holmes' arrest in 2005, which constitutes a discovery violation under Pa.R.Crim.P. 573. More specifically, Holmes had been arrested for an unrelated 2005 shooting that occurred in the same area as the instant murder. Holmes contends the prosecution acted in bad faith when it did not

turn over these documents to the defense until April 2011. Holmes claims that this late discovery prejudiced his ability to file a pre-trial motion to preclude the evidence and also his "ability to prepare for trial and to strategize with his counsel as to how to present a counter narrative." Appellant's Brief, at 75.

Here, the information was not material to the instant case, *see* Pa.R.C.P. 573(B)(1), was not favorable to Holmes, *id.* at (B)(1)(a), and had not been requested by the defense. Thus, there is no merit to this claim.

Finally, Holmes asserts that the PCRA court erred in finding that there was no violation based on the cumulative impact of trial counsel's ineffective acts and omissions. Having determined that counsel was not ineffective with respect to all but one claim, and because we are remanding the case for an evidentiary hearing on that one claim, Holmes is not entitled to further relief based on the alleged cumulative impact of trial counsel's ineffectiveness.

Order vacated in part[17] and affirmed in part. Case remanded to the PCRA court for limited further proceedings consistent with this decision. Jurisdiction relinquished.[18]

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/14/2024

_____

[17] Again, we stress that our disposition today does not reach the merits of Holmes' after-discovered evidence claim, but merely requires an evidentiary hearing so that the PCRA judge may make an independent assessment regarding the credibility and significance of Fisher's and Johnson's recantations in light of the entire record and, in particular, the serious misconduct committed in other matters by some of the same officers involved in this case long after Holmes was tried, convicted, and sentenced.

[18] We acknowledge that Holmes' brother, Joshua, similarly filed a collateral appeal raising the issue of police misconduct, as an after-discovered evidence claim. However, in that appeal he only alleges Detective Pitts' malfeasance. *See Commonwealth v. Holmes*, 497 EDA 2023 (unpublished memorandum decision) (filed Aug. 1, 2024). Moreover, in this case Judge DiClaudio relies substantially on the credibility determinations made by Judge Byrd at a June 2019 PCRA proceeding, which related only to Joseph, noting that Judge Byrd "presided over [Joseph Holmes'] evidentiary hearing in 2013." *See* Trial Court Opinion, 9/7/23, at 8-9. Judge Byrd's 2013 hearing, however, did not address after-discovered evidence as it relates to either Fisher or Johnson. Moreover, trial in this case occurred 13 years ago, well before Johnson had signed the instant affidavit and before the "pattern and practice" of police misconduct surfaced publicly. For both of these reasons, we find that this case compels a different result.